T. C. BOWES v. STATE.

No. A-1584. Opinion Filed November 18, 1912.

(127 Pac. 883.)

1. INDICTMENT AND INFORMATION — Obstructing Justice — Statutes — Suppressing Evidence — Construction of Accusation — Penal Statutes—Following Language of Statute. (a) If a witness has been summoned or served with a subpoena to attend court and testify in any cause pending therein, any person who willfully prevents or dissuades such person from obeying such subpoena is guilty of a felony.

(b) When a doubt exists as to whether an information or indictment charges a felony or misdemeanor, the defendant should be given the benefit of the doubt, and the offense charged should be held to be a misdemeanor.

(c) Any person who maliciously, by any deceit or fraud, or by use of any threat, menace, or violence, intentionally prevents any party to an action or proceeding from procuring the attendance of a witness therein, when said witness has not been served or summoned with a subpoena, is guilty of a misdemeanor.

(d) The rule of common law that penal statutes are to be strictly construed is not in force in this state; but penal statutes must be construed liberally according to the fair import of their terms, for the purpose of effecting the objects for which they were enacted, and to promote justice.

(e) It is not necessary for an indictment or information to use the words in the statute in defining an offense, but other words conveying the same meaning may be used.

(f) An indictment or information is sufficient if the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language, and in such a manner as to enable a person of common understanding to know what is intended.

2.    **INTOXICATING LIQUORS**—Criminal Prosecutions—Punishment. The court has the power to render a judgment providing for the imprisonment of a defendant until a fine assessed against him for a violation of the prohibitory liquor law of the state has been paid.

3.    **PARTIES TO OFFENSES**—''Principals''—Evidence—Acts and Declarations of Conspirators. (a) All persons who are concerned in the commission of an offense are guilty as ''principals,'' and should be prosecuted and convicted as such.

(b)  Where two or more persons engage in a conspiracy to commit an offense, any statement made by one of such conspirators in pursuance of such conspiracy, and before the completion thereof, is competent evidence against his co-conspirators, although they may not have been present when such statements were made. This is equally true as to any acts done by co conspirators.

(Syllabus by the Court.)

*Appeal from Custer County Court;*
*J. C. McKnight, Judge.*

T. C. Bowes was convicted of suppressing evidence, and his punishment assessed at a fine of $250, and he appeals. Affirmed.

The information in this case is as follows:

"State of Oklahoma, Plaintiff, v. T. C. Bowes, Defendant

"In the name and by the authority of the state of Oklahoma, now comes E. J. Lindley, county attorney in and for the county and state aforesaid, and gives the court to know and be informed that heretofore, and for a long time prior to the information herein, one P. S. Brooks was, and still is, a material witness for the state in an action pending in this court wherein the state of Oklahoma is plaintiff and T. C. Bowes is defendant, charging the said T. C. Bowes with the crime of selling intoxicating liquor within the state of Oklahoma to the said P. S. Brooks; that on the 26th day of April, 1911, the 8th day of May, 1911, was duly set as the day of the trial of the said action, and that thereafter, on the 3d day of May, 1911, the day of trial was continued by agreement to the 18th day of May, 1911, to which day the said P. S. Brooks was duly subpoenaed in due course of law to appear and give evidence for the state in said action; that the said T. C. Bowes, late of Custer county, Oklahoma, on or about the 27th day of April, 1911, at and within said county and state, well knowing the premises, and knowing that the said P. S. Brooks would be subpoenaed to attend as a witness in said action as aforesaid, and devising to obstruct the course of justice in said county court of Custer county, Oklahoma, and maliciously in-

tending to prevent the attendance of the said P. S. Brooks as aforesaid, did then and there willfully, unlawfully, and designedly and unjustly use means, two wit, hired, employed, and induced the said P. S. Brooks, by giving him certain money and paying his expenses, to leave the jurisdiction of the said court, thereby to hinder and prevent the said P. S. Brooks from appearing before the said court when and where the said T. C. Bowes was held for trial, contrary to the form of the statutes in such case made and provided, and against the peace and dignity of the state of Oklahoma.

"E. J. LINDLEY, County Attorney.

"State of Oklahoma, County of Custer—ss.:

"Personally appeared P. S. Brooks, who first being duly sworn on his oath says that the statement contained in the above information is true. P. S. BROOKS.

"Subscribed and sworn to before me this 18th day of May, 1911.

"J. C. McKNIGHT, County Judge. [Seal.]"

Statement of the Evidence.

W. F. Armstrong testified for the state that he was clerk of the county court of Custer county, Okla.; that in the months of April and May, 1911, a criminal prosecution was pending in said court against appellant, T. C. Bowes, for a violation of the prohibitory liquor law; and that P. S. Brooks was a witness for the state in said cause.

P. S. Brooks testified that he resided in Custer county, Okla.; that he was the prosecuting witness against appellant, Bowes, in a case pending in the county court of Custer county, wherein appellant was charged with violating the prohibitory liquor law; that in March, 1911, appellant came to an old house, about a quarter of a mile from the residence of the father of witness; that one Joe Winters came to the house of the father of witness in a buggy; and that witness went with the said Winters to the old house where appellant was and there saw appellant. Witness then testified as follows:

"Q. I believe you stated, Mr. Brooks, that the defendant, Bowes, came out of the house? A. Yes, sir. Q. Did you get out of the buggy? A. Yes, sir. Q. Did Winters get out of the buggy? A. I think so. Q. Did you have any conversation with the defendant at that time? A. I did. Q. Tell the jury what he said. A. He said he came up to see me, and he wanted to see if

there was any way of getting shut of my evidence in a case he had pending in court, and he made me a proposition. Q. Go ahead and tell the jury all about it. A. He said he would pay a man to cultivate my crop, and would pay my expenses if I would get out of the way of the court until his trial came up. He said maybe if, when he went to trial, then he could beat his case, or something to that effect. Q. When was that? A. It was about the 20th day of March, as near as I can remember. Q. Did you talk to him very long? A. I don't suppose we were there over 30 minutes. Q. Where did you go after that, Slim? A. I went up to my father's house. Q. Where did the defendant go? A. They got in the buggy, and I supposed they went home. Q. Who do you mean by 'they'? A. Winters and Bowes. Q. Well, now, was this the only time you talked to the defendant up there? A. Yes, sir. Q. Did the defendant make any other remark at that time? A. He told me that he would have Joe Shive to watch the docket when his case was set for trial, and he would let me know before I got subpoenaed. Q. Did he say anything to Winters when he drove up there? A. I don't know. Q. Did Winters say anything to him? A. Not that I remember of; but he may have. Q. State whether or not they had anything to drink. A. Yes, sir. (Objected to as immaterial. By the Court: He has answered.) Q. Was there any conversation had about the drinking? A. No, sir; not that I remember of. Q. Now tell the jury, Mr. Brooks, when and where you saw the defendant next. A. I saw him in Clinton next. Q. In Clinton? Do you remember the time? A. On the 27th day of April, I think. Q. Were you in Clinton on the 27th day of April? A. Yes, sir. Q. What were you doing in Clinton on that date? A. I went to leave the country, to get on the train. Q. Did you go for your pay down there? A. Yes, sir. Q. Well, how did you happen to go on the 27th of April, instead of some other day? A. Well, Joe Winters came to my house on the 25th of April— (Objected to any statement on the part of Joe Winters, unless made in the presence of the defendant, or the defendant is in some way connected to it, as incompetent, irrelevant, and immaterial, and prejudicial to the rights of the defendant, or unless it is shown that Joe Winters is authorized to represent the defendant. By the Court: Overruled. By the Defendant: Give us an exception.) A. Joe Winters came to my house on the 25th of April— (Object to anything that Joe Winters said. By the Court: Overruled. By the Defendant: Exceptions.) Q. Did you have a conversation with Winters on that occasion? A. Yes, sir; and on the 27th I went to Clinton. Q. Now, tell the jury what occurred in Clinton

on the 27th of April. First, what time did you get down there? A. It was in the afternoon; something like 2 o'clock in the afternoon. Q. What did you do down there on the 27th, Mr. Brooks? A. I stayed there that evening and that night. Q. Did you see the defendant there that time? A. Yes, sir. Q. Who was with him? A. I don't remember that any one was with him. I seen him around in the town; just seen him walking around over the town. Q. Did you have any conversation with the defendant about— on the afternoon of the 27th of April? A. I couldn't say that I did. Q. The 27th of April? A. I might have spoke to him. That night I had a conversation with him. Q. Tell the jury all the circumstances of that conversation and what it was. A. Well, that night, about 7:30 that evening, I was aiming to go away on that 8 o'clock train East when— Do you want me to tell what he said? A. Yes; what he said, and where, and all the circumstances. A. That evening, about 7:30 or 7 o'clock, I got some money from Joe Winters. * * * I got $17 from Joe Winters that night, and there was $33 to come yet; and when I got the rest I was to leave on the 8 o'clock train. Q. Did you see Bowes, this defendant, about the time you got the money? A. Yes, sir. Q. Tell the jury where Bowes was. A. I was, as near as I remember, I was sitting about the Oklahoma State Bank, talking to Joe Winters, and he said he would get the money for me. * * * I was talking to Winters, and he went and got the money and gave it to me. Q. Where did he get it? A. I don't know. He went and talked to Bowes, and came back and gave me the money. Q. Did you see Winters go to Bowes? A. I did. Q. Where was he? A. He was standing just a little east of the Oklahoma State Bank. Q. State whether or not Bowes went into the bank? A. Not that night he didn't. Q. How long did Bowes and Winters talk together, did you say? A. Possibly five minutes. Q. Did Winters come back to you from Bowes? A. He did. Q. State whether or not he gave you the money at that time? A. He gave me the $17, and said that was all he could get. * * * Q. Did you say anything at all to Bowes on the evening of the 27th of April? A. Yes, sir; I talked to him, and he said he would get the rest of the money in the morning. Q. That was after you had the $17? A. Yes, sir. Q. You say Bowes told you after that that he would get the balance of it in the morning? A. Yes, sir; I had to stay all night. I didn't get away on the 8 o'clock train. Q. I will ask you to state, Brooks, why you didn't leave on the evening of the 27th of April? A. Because I didn't get all the money that Bowes was to get up for me. Q. State what day of the week the 27th of April was on?

A. I think it was on Thursday. Q. Now, Mr. Brooks, state if you transacted any business in Clinton on the afternoon of the 27th of April? * * * By the County Attorney: Tell the jury what business transaction you had? A. By the Witness: I bought a suit of clothes. Q. Where did you buy them? A. I bought them of Max Weisenbarger. He run a store just west of the First State Bank. Q. You say you bought a suit of clothes there? A. Yes, sir. Q. About what time of the day was it you bought the suit of clothes of Max? A. Along about 4 o'clock—somewhere along there—I went in and got them, and told him I would pay for them after awhile; but I didn't get the clothes until next morning. Q. You bought them in the afternoon, and didn't get them until the next morning? A. Yes, sir. Q. What was the reason you didn't get them in the afternoon? A. I didn't have all the money. Q. You didn't have the money that afternoon? A. No, sir; I had $17 at that time. Q. Was the store closed at that time? A. I think the store closed at 7 o'clock, and Max took the clothes to the hotel with him, and said I could get them there. Q. State whether or not the defendant, Bowes, had anything to do with the payment of that suit of clothes? A. Not that I know of. Q. Did you see this defendant on the evening of the 27th in the store? A. No, sir; I didn't. Q. Did you see him attempting to cash a check? * * * A. I heard he was trying to get a check cashed that evening about 8 o'clock. Q. By the Defendant: You say you heard of his trying to get a check cashed? A. I heard him ask a party or two. Q. By the County Attorney: Did you see the check? A. I seen a piece of paper in his hand. Q. Did he tell you what he was going to do with the check? A. I couldn't say. Q. He didn't give you a check? A. No, sir. Q. You say this was on the evening of the 27th of April? A. Yes, sir; I think so. Q. Were you in Clinton on the next day? A. Yes, sir; I stayed there all that night. Q. Did you see the defendant on Friday morning, the 28th? A. Yes, sir. Q. Did you talk to him that next morning? A. I spoke to him; said a word or two to him; and he said, 'Joe Winters will see you.' Q. He met you on the street? A. Yes, sir; about 9 o'clock I saw him go into Tom Nance's bank, him and Winters, and then Winters went on toward the depot, and I met Bowes, and he said Winters will see me. Q. Then, just as you were passing, he made that remark? A. Yes, sir. Q. Where had they come from before that? A. Bowes came out of the bank. I saw them meet about the bank. Q. What did you do then? A. I went on to the first wagon yard east of the bank. I went in there and seen Winters. Q. What transaction took place there between you and

Winters? * * * A. Joe Winters give me $33 in money, and I give him a note for $50. Q. Where did you go from there after you left the wagon yard? A. I went back up to the store and got my clothes, and went down to the junction north of Clinton and got on an east-bound train. Q. What train? A. On the Rock Island east. Q. Where did you go? A. I went to Oklahoma City. Q. Was that on the noon train? A. Yes, sir. Q. Now, you say Winters give you $33 on the morning of the 28th, and $17 on the evening of the 27th of April? A. Yes, sir. Q. You stated you gave your note to Winters for $50? A. Yes, sir. Q. What was your understanding? What was you to do with the note, with relation to the payment of the note? A. I wasn't to pay it. Q. You wasn't to pay it? A. No, sir. Q. What was to be done with it? A. After Bowes' trial was over, it was to be destroyed. Q. State, if you know, why the note was given; whether or not it was just given as a subterfuge or a blind? * * * Q. When you left the wagon yard, when you stated you signed the note and got the $33, which way did you go uptown? A. I went up the west way. Q. From the time you got the $33 until you left town, did you see the defendant? A. Yes, sir. Q. Did he say anything to you? A. Yes, sir. Q. What did he say to you? A. He said, 'Don't let Wesley Cole see you get on the train,' and I told him I would go to the junction and get on. Q. You met him on the street? A. Yes, sir. Q. Tell the jury your trip and rounds? A. Well, I went to Oklahoma City and stayed there until the next morning, and I went to Norman and went out to where my sister lives. That was on Saturday. Well, on Sunday I came back up to Oklahoma City and stayed there all night Sunday night, and on Monday morning I came home from Oklahoma City. Q. What day of the month was that? A. About the 30th, I reckon. Q. You say you returned home on Monday? A. Yes, sir. Q. Following the Friday you had gone away? A. Yes, sir."

This witness further testified that he was arrested for trying to evade the service of a subpoena and placed in jail, charged with this offense, and that this subpoena was served on him in the Custer county jail.

J. H. Redwine testified for the state that he resided near the home of B. F. Brooks, the father of the witness P. S. Brooks; that some time in March Joe Winters came out to the house of Mr. Brooks, and when he left the house of B. F. Brooks the witness P. S. Brooks was in the buggy with him.

B. F. Brooks testified that he was the father of the witness P. S. Brooks; that some time in March Joe Winters came to his house and stayed there about 30 minutes; that when he left P. S. Brooks got in the buggy and drove off with him.

Jim Bland testified for the state: That some time in the month of March he saw Joe Winters and appellant, Bowes, in the buggy out in the neighborhood of Mr. B. F. Brooks'. They said they had been out to see Mr. B. F. Brooks.

Max Weisenbarger testified for the state: That he worked in a clothing store, in the town of Clinton, belonging to Hass Bros. That P. S. Brooks, the state's witness, had purchased a suit of clothes from witness one afternoon, but did not pay for them. That witness took the clothes to the hotel, and waited and waited, and next morning witness Brooks came and paid for the suit. At the same time appellant, T. C. Bowes, attempted to get witness to cash a check for him, which witness could not do. The check was for something like $30, $32, or $33. Appellant told witness that if he could get the check cashed he could take the money out for the suit.

W. F. Cabaniss testified for the state that he was acquainted with appellant and also with P. S. Brooks; that early in the spring he saw witness P. S. Brooks; that at the same time he saw Winters in Clinton, and Winters told witness that if he saw Bowes to tell him that he (Winters) wanted to see him.

Del Clark testified for the state that he was deputy sheriff of Custer county, Okla.; that he had a subpoena for the witness P. S. Brooks in the early part of May; that he learned that said Brooks had gone to the eastern part of the state; that witness went looking for Brooks, and found him later and placed him in jail, when the subpoena was served upon him by the sheriff.

Joe Winters testified for the defendant that he resided in Clinton; that he knew appellant and also knew P. S. Brooks. Witness then testified as follows:

"A. Well, I went to Mr. Brooks' house, the old gentleman, to see about making a farm loan. Slim told me that his father was going to make a farm loan, and he said he thought that I could loan him the money. I went to see the old gentleman about it. Prior to this, though, in connection with this case, I

saw Slim over here in town long before there was any trial, and he sent word by me to Bowes that he wasn't going to appear against him. That is how I happened to get mixed up in this deal at all. I told Dee that, and he said: 'Some time when I am going out in there, I want to take a ride with you.' And this time I see him, and I said to him, 'I am going out west;' and we went out there to the west, and when, before we got out there, when Dee found out where I was going he said, 'I am not going up to the house,' as he didn't want to see Brooks. Well, there is an old house—I used to own the farm—there is an old house this side of where the old gentleman lives, and Dee said: 'I will get out here, and you can go on over and see the old man Brooks, and I will wait here at this old house and be here when you come back.' Well, I went on over to see the old man Brooks, and we talked to Brooks, and this bootlegging business came up, and Severe said, 'I haven't got it in for Dee.' Well, he left while I was there, and went up to some kind of an old disc up in a field. Anyway, I finished my business with the old man. I made arrangements whereby I could get a loan through. He wanted $4,000. I made arrangements afterwards and approved a $3,200 loan on the half section; but he needed $4,000. As I drove back to where Dee was, he drove back, and rode over with me to see Dee. They got together and got to talking there, kind of laughing about the case, and Slim said to Dee: 'I haven't got it in for your fellows. I haven't it in for you. I am sorry I done it; but I had to do it.' He said, 'I am not going to appear against you.' He said, 'I am sorry it come up.' That is all there is to it. I didn't know when it was set for trial; and, in fact, it wasn't set for a month afterwards. So we came on back, and then I went back out there two or three times, and I took Mr. Richardson out there one time to see Brooks. Well, Slim came to me one day and said he wanted some money. (The state will object to any statements made by Brooks to this witness. By the Court: Sustained.) Q. What did Brooks say, if anything, about getting this $50? A. He said he wanted to go away, and wanted to get some clothes. He said he wanted to get the money of me, and I told him that I didn't have the money to loan, but if he couldn't get it anywhere else I would let him have it. Q. Was there anything said by you to Brooks, with reference to this Bowes case, in making the loan? A. No, sir. Q. Where was he at the time he made this $50 loan? A. I think the first day was here in Arapaho. I told him if he couldn't get it I would let him have it. Q. When was it that you made the loan? A. I gave it to him a part at one time and a part at another time. Q. You heard the testimony of Brooks that it

was to never be paid back? A. Yes, sir. Q. Is that true? A. No, sir. Q. What, if anything, was said by him at the time this note was made with reference to commission? A. It was understood by Brooks that if I got the loan through that I would make it right with him. It was a good deal, and we loan people have a rule that we will treat a fellow right if he throws any deal our way. Q. I will have you look at that note, Mr. Winters, and state what it is. A. That is a note for $50. Q. Is that the note given by Brooks to you? A. Yes, sir. Q. Was there anything in reference to Brooks leaving the state said to the note? A. I don't know a thing about it. Q. You heard him testify that at that time that you said you didn't care whether he left the state or not. A. I said that. I told him—well, I don't remember saying that, but that was my sentiments. Q. In all your transaction with Severe Brooks, did it have any connections with Bowes, or anything to do with the Bowes case? A. It did not. (At this time the defendant offered in evidence a note, signed by P. S. Brooks, which note is marked 'Exhibit A' by the stenographer, and is read to the jury. Said note is in words and figures as follows: 'Exhibit A. W. F. A. $50.00. Clinton, Okla., Apr. 17, 11. On Sept. 1, 1911, I, we, or either of us promise to pay to the order of J. A. Winters fifty dollars $50.00) at the First State Bank, Clinton, Oklahoma, with interest at the rate of 10 per cent. per annum from date, payable semiannually. Interest, if not paid when due, to be added to the principal, and draw the same rate of interest. And 10 per cent. on the amount due as attorney's fees, if placed in the hands of an attorney for collection after maturity. The sureties or indorsers hereby waive protest, and notice of protest, and nonpayment of this note at maturity. P. S. Brooks, Sec.———, Twp.———, R. ———. P. O.———.') Q. State to the jury how it came that you give him a part of the money at one time and a part of it another time? A. I didn't have the amount at the first time. Q. Do you remember what you paid him the first time? A. I don't know; something like $15, $16, or possibly $17. I think he stated $17. Q. Did you give him any of the money for Bowes? A. No. sir. Q. Was there any connection between you and Bowes? A. There was not. Q. This deal between you and Brooks was a *bona fide* transaction? A. Yes, sir. Q. You give him this $50 as an accommodation only? A. Yes, sir; I give it to him in cash."

Appellant testified in his own behalf as follows:

"Q. Did you see the prosecuting witness, Brooks, while out there? A. Yes, sir. Q. Did you have a conversation with him with reference to the case in the court? A. Yes, sir. Q. What

did he say about it? A. He said he was sorry he had done what he did, and he wasn't going to appear against me. He said he was forced to do what he did. Q. Did he say by whom? A. No, sir. Q. Did you begin the conversation, or did he begin it? A. He, did. Q. Did you go clear up to the home of Brooks? A. No, sir. Q. Why didn't you want to go? A. I had heard that he was there, and I didn't want to mix with him. Q. How did you hear it? A. There was some boys coming around a big canyon, and we met them and asked them if we could get through, and they said we would have to go around; for they had just seen Severe Brooks go around that way that morning, and he said we would have to go around. Q. He said he wasn't going to appear against you? A. Yes, sir. Q. He said he was forced to do what he had done? A. Yes, sir. Q. What was said, if anything, with reference to his leaving the state? A. He never said anything to me about it. Q. You heard him testify with reference to you hiring him a hand and paying his expenses to leave the state. Was there any conversation like that passed? A. No, sir. Q. He told you he wasn't going to appear against you? A. Yes, sir. Q. Now, Mr. Bowes, you heard his testimony with reference to a transaction with you and Winters that just left the stand? A. Yes, sir. Q. Did you, directly or indirectly, pay any one money to cause Brooks to leave the state, or the jurisdiction of the court? (At this time the state moves the court to strike the question from the record, for the reason it is leading. By the Court: Overruled.) A. I never did. Q. How long have you known Brooks, Mr. Bowes? A. Ten or twelve years, I guess. Q. How long have you known Winters? A. About the same time. Q. Now, Mr. Bowes, you heard the testimony of this sheeny that testified, Max Weisenbarger? A. Yes, sir. Q. Do you know what he does in Clinton? A. Yes, sir. Q. What? A. He works in a clothing store in Clinton. Q. Just as a clerk? A. I think so. Q. Did you hear him testify in reference to you wanting him to cash a check? A. Yes, sir. Q. Was that true or not? A. I never give him any check. Q. Were you in his store on the night of the 27th day of April? A. No, sir. Q. I believe you testified you never paid Brooks any money, either directly or indirectly, to leave the state? A. No, sir; I never did."

*George T. Webster* and *W. J. Lackey,* for appellant,

*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, P. J. (after stating the facts as above). First. In their brief counsel for appellant contend that, if the facts al-

leged in the information against appellant constitute an offense, it is a felony of which the county court of Custer county did not have jurisdiction. With this contention we cannot agree.

Section 2195, Comp. Laws 1909, is as follows:

"Every person who willfully prevents or dissuades any person who has been duly summoned or subpoenaed as a witness from attending pursuant to the command of the summons or subpoena is guilty of a felony."

From this it is seen that, in order to make the acts charged in the information a felony, it is necessary that the witness who was so prevented or dissuaded from attending court must have been duly summoned or subpoenaed as a witness at the time the acts complained of were committed. At first sight there is an apparent obscurity in the information as to when the witness was subpoenaed; but upon a careful reading of the entire information we think that it sufficiently appears that the witness was not served with a subpoena until after the acts charged were alleged to have been committed. There can be no question but that the acts charged in the information constitute an offense; and where a doubt exists as to whether or not the information charges a felony or misdemeanor, the defendant should be given the benefit of the doubt, and the information should be held good for a misdemeanor.

Section 2213, Comp. Laws 1909, is as follows:

"Section 2213. Suppressing Evidence.—Every person who maliciously practices any deceit or fraud, or uses any threat, menace or violence, with intent to prevent any party to an action or proceeding from obtaining or producing therein any book, paper, or other matter or thing which might be evidence, or from procuring the attendance or testimony of any witness therein, or with intent to prevent any person having in his possession any book, paper, or other matter or thing which might be evidence in such suit or proceeding, or prevent any person being cognizant of any fact material thereto from producing or disclosing the same, is guilty of a misdemeanor."

It is true the information is not a model, yet we think it sufficiently informed the appellant of the fact that he was charged with having maliciously attempted to prevent the state from procuring the attendance of P. S. Brooks as a witness against ap-

pellant in a case then pending in the county court of Custer county, wherein appellant was charged with a violation of the prohibitory liquor law.

Section 2027, Comp. Laws 1909, is as follows:

"The rule of common law that penal statutes are to be strictly construed, has no application to this Code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice."

In construing section 2213, we must therefore disregard the common-law rule that penal statutes are to be strictly construed, and give section 2213 such a construction as will enable it to effect the objects for which it was enacted, and to promote justice. Under this rule of construction, we think that the acts charged in the information bring the offense within section 2213.

Section 6703, Comp. Laws 1909, is as follows:

"Words used in a statute to define a public offense need not be strictly pursued in the indictment; but other words conveying the same meaning may be used."

Paragraph 6 of section 6704, Comp. Laws 1909, with reference to indictments, is as follows:

"6. That the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended."

Applying these statutory provisions to the information, we think that a person of common understanding would know from reading this information that is was intended to charge that appellant maliciously—that is, with intent to injure the state—hired, induced, and employed the said P. S. Brooks, by giving him a certain sum of money and paying his expenses, to leave the jurisdiction of the court, and did thereby hinder and prevent the said P. S. Brooks from appearing before said court and giving his testimony in behalf of the state in a prosecution then pending against appellant in the county court of Custer county, as described in the information. We think this substantially charged the offense under section 2213.

Second. The next contention of counsel for appellant is that under the verdict rendered by the jury only a civil judgment for

money could be rendered against appellant, and that the court erred in rendering a judgment that the defendant be imprisoned for nonpayment of the fine. There is no merit in this contention, and the court did not err in the judgment rendered, providing for the imprisonment of appellant until the fine was paid. See *Ex parte Bowes, ante,* 127 Pac. 20.

Third. If human testimony is worth anything, the evidence in this case conclusively establishes the guilt of appellant of the offense charged. If every man who endeavors to induce witnesses to evade the service of process or disobey procsss which has been served were vigorously prosecuted and convicted, the administration of justice in Oklahoma would be much more certain and expeditious.

We find no error in the record prejudicial to appellant. We think, however, that the trial court erred in not permitting the state to prove all that was said and done by J. A. Winters, who was evidently acting in connection with appellant in the commission of this crime. Under the law he is just as guilty as appellant. Section 2045, Comp. Laws 1909, is as follows:

"All persons concerned in the commission of crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals."

Any statements he may have made with reference to this matter during the continuance of the conspiracy between himself and the appellant to commit the crime charged, either to the state's witness P. S. Brooks or any other person, were competent evidence against the appellant, although the appellant might not have been present and heard the conversation. See *James Holmes v. State,* 6 Okla. Cr. 541, 117 Pac. 651.

The judgment of the lower court is in all things affirmed.

DOYLE, J., concurs. ARMSTRONG, J., absent, and not participating.