## FRED HUNTER v. STATE.

No. A-1657. Opinion Filed September 17, 1913.

(134 Pac. 1134.)

1. STATUTES—Witnesses—Competency—Husband and Wife — Parent and Child—Construction of Penal Statutes—"Offense Against the Wife"—"Crime Committed One Against the Other." (a) The doctrine of a strict construction of penal statutes has no place in the criminal jurisprudence of Oklahoma; but, on the contrary, such statutes will be liberally construed so as to enable them to reach and destroy the evils at which they are aimed.

(b) In a prosecution against a father for willfully failing to supply his children with necessary food, clothing, shelter, or medical attendance, his wife is a competent witness against him.

2. APPEAL—Objection Below—Reception of Evidence. Where the testimony of a wife is received without objection against her husband, such matter cannot be complained of upon appeal.

3. PARENT AND CHILD—Prosecution for Nonsupport—Defense. Where a father is upon trial charged with having failed to fur-

nish his child with necessary food and clothing, it is no defense to show that such food and clothing were not necessary because they were voluntarily furnished by other persons.

*Appeal from County Court, Oklahoma County;*
*John W. Hayson, Judge.*

Fred Hunter was convicted of willfully failing to properly support his minor child, and appeals. Affirmed.

*G. A. Paul* and *O. H. Lee,* for appellant.

*Joseph L. Hull,* Asst. Atty. Gen., for the State.

FURMAN, J. It is earnestly contended by counsel for appellant that, when a husband is upon trial charged with having failed, without lawful excuse, to furnish necessary food, clothing, shelter, and medical attention for his child, this offense involves only a breach of duty, which the parent owes to the state and to the child, and is not an offense personal to the mother of the child, and that in such cases the mother of the child, being the wife of the defendant, is not a competent witness against him. In support of this proposition counsel for appellant have filed an able and elaborate brief based upon common-law principles and upon the statute law of Oklahoma. The statutes involved are as follows:

Section 2434, Rev. Laws 1910, provides:

"Any parent of any child who willfully omits, without lawful excuse, to perform any duty imposed upon him by law to furnish necessary food, clothing, shelter or medical attendance for such child is guilty of a misdemeanor."

This statute rightfully places upon the shoulders of the parents the duty and responsibility of furnishing necessary food, clothing, shelter, and medical attention for their children, and makes it a crime for them to willfully omit to discharge this obligation. This duty is first upon the father, who is the head of the family, and in case of his inability to perform this duty, then it devolves upon the mother as far as possible. This is not only the law of the land, but the plain dictate of humanity and justice. It is also in strict harmony with the divine law. In the eighth verse, fifth chapter, I Timothy, we are told:

"But if any provide not for his own, and specially for those of his own house, he hath denied the faith, and is worse than an infidel."

Section 5882, Rev. Laws 1910, is as follows:

"Except as otherwise provided in this and the following chapter, the rules of evidence in civil cases are applicable also in criminal cases: Provided, however, that neither husband nor wife shall in any case be a witness against the other except in a criminal prosecution for a crime committed one against the other, but they may in all criminal cases be witnesses for each other, and shall be subject to cross-examination as other witnesses, and shall in no event on a criminal trial be permitted to disclose communications made by one to the other except on a trial of an offense committed by one against the other."

The pivotal question in this case depends upon what constitutes "a crime committed one against the other," or "an offense committed by one against the other." It is seen by this that the statute uses the words "offense" and "crime" interchangeably. This is broader than the common-law rule. We agree that at common law the wife can only testify against her husband for an offense committed against her person, and that under the common-law doctrine of a strict construction of penal statutes it might, with some show of reason, be held that this rule governs in the construction of the statute in question; but this doctrine has been repudiated by the courts of this state—in fact, it has no place in the criminal jurisprudence of Oklahoma. On the contrary, we have always held that the penal laws of this state should be construed according to their reason and spirit, and they should receive that liberal construction which will enable them to reach and destroy the evils at which they are aimed. See *Turner v. State,* 8 Okla. Cr. 11, 126 Pac. 452, and *Bowes v. State,* 8 Okla. Cr. 277, 127 Pac. 883, and all other cases ever decided by this court where the same question was presented.

Acting upon this rule of construction, in the case of *Heacock v. State,* 4 Okla. Cr. 606, 112 Pac. 949, this court held that adultery was an offense against the wife, and she was a competent witness against her husband in such a prosecution. We have always thought that it was an outrage that a wife could be

a witness against her husband for a personal assault upon her body, which might involve but little injury, and have been the result of hasty and inconsiderate passion, and deeply regretted as soon as committed, but that the wife could not testify as to matters involving virtue and womanhood, which directly affected her rights as a wife, and which would constitute much greater cruelty and injury than could be inflicted by personal violence.

In reason and in justice we believe that whenever a husband or wife is guilty of conduct which constitutes a public offense, and which also constitutes a direct violation of the legal rights of the other, the crime is against such other, as well as against the public, and that such husband or wife should be permitted to testify in all such cases. Suppose a husband should publish a libel or slander upon his wife, would it not be a prostitution of reason, and a mockery upon justice to exclude her evidence upon the ground that it would impair the sanctity of the home and destroy the confidence, peace, and harmony of the marital relations, to permit her to testify? Many other illustrations could be offered. What we are after is the principle involved, the ground upon which the testimony of the wife is excluded. Considering the substance rather than the form of things, we are of the opinion that the idea that the wife can only testify against her husband for an assault committed upon her person is a relic of barbarism. We decline to perpetuate any such idea in Oklahoma.

The brief filed in this cause on behalf of the state by Assistant Attorney General Joseph L. Hull contains an admirable discussion of this question as a matter of principle. This argument appeals so strongly to us that we will incorporate it in our opinion as follows:

"The old common-law rule was broader than the statutory provision. It made the husband or wife incompetent to testify *for* or *against* the other spouse. The incompetency to testify *for* the other spouse seems to have been based upon the theory that husband and wife being one in law, the interest rule disqualified the wife. With the abolition, however, of the rule disqualifying witnesses because of interest, the reason for making

the wife incompetent to testify *for* her husband disappeared. This, we presume, was the reason for the change made by our statute, making the wife competent to testify *for* her husband. The common-law rule making one spouse an incompetent witness *against* the other one, however, was founded upon different considerations. Its origin, according to Mr. Wigmore, is obscure, but seems to date from the time of its incorporation in the works of Sir Edward Coke. Since then various reasons have been given for it.

"Now, however, two reasons are generally given for its adoption. These are stated and criticised by Mr. Wigmore, as follows:

"'Of the reasons which call for serious consideration there seem to be distinguishable no more than two. (a) The first of these is the argument so often repeated in the more modern opinions (though ranging back also among the oldest of the arguments), namely, *the danger of causing dissension* and of "disturbing the peace of families." Of this it may be premised, to be sure, that no manner of attempt was ever made by any court to enforce this reason logically, and thus to test the accuracy of its utterances. For example, in the very case in which Mr. Justice Grose purported by this rule to safeguard the ineffable domestic peace, the husband had long before absconded and married another wife; so that the learned judge's application of this reason exposed him to the citation of the proverbial expression about stable doors. But, if we are to ignore the futility of appealing to a reason which is never allowed in practice to be logically applied, and are to treat it as a serious argument, the answer is, first, that the peace of families does not essentially depend on this immunity from compulsory testimony, anl next, that, so far as it might be affected, that result is not to be allowed to stand in the way of doing justice to others. When one thinks of the multifold circumstances of life that contribute to cause marital dissension, the liability to give unfavorable testimony appears as only a casual and minor one, not to be exaggerated into a foundation for so important a rule. It is incorrect to assume that there exists in the normal domestic union an imminent danger of shattering an ideal state of harmony solely by the liability to testify unfavorably. Moreover, the significance of the argument is that, if Doe has committed a wrong against Roe, and Doe's wife's testimony is needed for proving that wrong, Doe, the very wrongdoer, is to be licensed

to withhold it and thus secure immunity from giving redress, because, forsooth, Doe's own marital peace will be thereby endangered—a curious piece of policy, by which the wrongdoer's own interests are consulted in determining whether justice shall have its course against him. This alone, without further following into the details of the reasoning, will serve to exhibit that argument's fallacy. (b) A second reason, having some plausibility, and well expressed in the language of Mr. Justice Irvin and Mr. Justice Campbell, comes in substance to this, that there is a *natural repugnance* in every fair-minded person to compelling a wife or husband to be the means of the other's condemnation, and to compelling the culprit to the humiliation of being condemned by the words of his intimate life partner. This reason, if we reflect upon it, is at least founded on a fact, and it seems after all to constitute the real and sole strength of the opposition to abolishing the privilege. Let it be confessed, then, that this feeling exists, and that it is a natural one. But does it suffice as a reason for the rule? In the first place, it is no more than a sentiment. It does not posit any direct and practical consequences of evil. It is much the same reason that any one might give for abolishing the office of hangman in the jail or the business of spies in a war. In the next place, it exemplifies that general spirit of sportsmanship, which, as elsewhere seen, so permeates the rule of procedure inherited from our Anglo-Norman ancestors. The process of litigation (many learned judges agree) is a noble kind of sport, and certain rules of fair play should never be overstepped. One of these is to give something of a start to the victim of the chase, to follow him by certain rules, and to respect his feelings so far as may be. This complicates the sport, and adds zest for the pursuers by increasing the skill and art required by them for success. The expedient of convicting a man out of the mouth of his wife is (let us say) poor sport, and we shall not stoop to it. Such is the theory and sentiment of sportsmanship. The answer to it is the answer that has had to be made for all the instances of its invocation, namely, that litigation is not a game, and that the law can never afford to recognize it as such. That the law, moreover, does not proceed by sentiment but aims at justice. This generality would perhaps never be disputed; but in actual argument the constant tendency is to confuse sentiment with reason. A learned judge, for example, refuses to compel this testimony for the mere sake of "ferreting out" the fact. Why

sneer at the investigation of truth by the innuendo of "ferreting" as though some petty and dishonorable practice were involved? This argument by innuendo is typical enough of much of the reasoning in support of the present privilege. Let us face the fact that, when a party appears in a court of justice, charged with wrong or crime, the unavoidable and solemn business of the court and the law is to find out whether he has been guilty of the wrong or crime; that the state and the complainant have a right to the truth; and that this high and solemn duty of doing justice and of establishing the truth is not to be obstructed by considerations of sentiment in this respect any more than in others. So far as any recorded utterance has yet been found, no logical argument advanced for the present privilege has ever arisen to a higher level than an appeal to the same considerations of sentiment.' (4 Wigmore on Evidence, sec. 2228, pp. 3039-3041.)

"The old common-law rule recognized an exception thereto. This exception was limited to cases of personal violence inflicted by one spouse upon the other.

" 'That exception was commonly placed on the ground of necessity—that is, a necessity to avoid that extreme injustice to the excluded spouse which would ensue upon an undeviating enforcement of the rule. The notion of necessity, indeed, might commendably have been a broader one; the necessity of doing justice to other persons in general, when the spouse's testimony was indispensable, would have been at least as great. But the common lawyers here kept their eyes upon the ground, and did not allow their survey to exceed the range of immediate and unavoidable vision.' (4 Wigmore, sec. 2239, p. 3056.)

"This, then, was the state of the law at the time of the adoption of the statute in this state. In short, one spouse was incompetent to testify against the other, except in cases of personal violence by one against the other. The statute states the exception differently, however. It provides that one spouse may testify against the other 'in a criminal prosecution for a crime committed one against the other.'

"What is the meaning of this phrase, 'a crime committed one against the other?' Is it merely declaratory of the common law, meaning, in fact, when personal violence is inflicted by one against the other, or has it a broader meaning, based upon

the philosophy of the rule, and including all crimes interrupting and objectionable to the marriage relation?

"A respectable array of authorities, we concede, might be cited in support of the narrower construction. But the courts in those cases, we respectfully submit, have blindly followed precedents not based upon reason, and have yielded to that foolish sentimental impulse, which, as Mr. Wigmore so rightly remaiks, is the real foundation of this rule. This court has declared more than once that it will follow no precedents not founded upon reason; that Oklahoma shall be ruled by the living and not by the dead.

"The authorities supporting the narrower doctrine hold that even adultery, incest, and bigamy do not come within the exception, because no personal violence is inflicted upon the wife in such cases. We cite this to show to what extent the narrower construction leads. Let us not forget that the purpose of the rule was to avoid any disturbance of the family peace. And these decisions, holding the wife incompetent in such cases, practically say to the husband:

" 'You may break your wife's heart by criminal intercourse with other women; you may go so far as to lie in the bed of a bigamous wife; you may even outrage your own children; and we will not permit your wife to testify against you, because it tends to interrupt the harmony of the family relation.'

"How much more reason is there in the other rule? How much more in keeping with the real purpose and object of the rule is the other doctrine, which says:

" 'We will protect your family peace from danger of disturbance by the adverse testimony of your spouse, so long as you by your conduct do not yourself disturb it. But the law will not protect that peace, when you have shattered it beyond hope of mending it.'

"The point was raised in a case before the Utah Supreme Court. It was appealed from there to the Supreme Court of the United States. Mr. Justice Brewer, writing the opinion, reversed the Utah court—the case was a prosecution for polygamy —and adopted the narrower construction. The two views of the statute cannot be better presented, we think, than by quoting from the opinions of the two courts in this case.

"Mr. Justice Brewer, adopting the narrower construction, said:

" 'Is polygamy such a crime against the wife? That it is no wrong upon her person is conceded, and the common-law exception to the silence upon the lips of husband and wife was only broken, as we have noticed, in cases of assault of one upon the other. That it is humiliation and outrage to her is evident. If that is the test, what limit is imposed? Is the wife not humiliated, is not her respect and love for her husband outraged and betrayed, when he forgets his integrity as a man and violates any human and divine enactments? Is she less sensitive, is she less humiliated, when he commits murder, or robbery, or forgery, than when he commits polygamy or adultery? A true wife feels keenly any wrong of her husband, and her loyalty and reverence are wounded and humiliated by such conduct. But the question presented by this statute is not how much she feels or suffers, but whether the crime is one against her. Polygamy and adultery may be crimes which involve disloyalty to the marital relation, but they are rather crimes against such relation than against the wife, and, as the statute speaks of crimes against her, it is simply an affirmation of the old familiar and just common-law rule.' (*Bassett v. U. S.,* 137 U. S. 506, 11 Sup. Ct. 167, 34 L. Ed. 765.)

"In the same case, in the Utah Supreme Court, Mr. Chief Justice Zane said:

" 'Whenever the act or the conduct which constitutes a public offense or crime consists in a direct violation of the rights of an individual, the crime is against that individual, as well as against the public. The law recognizes the marital rights of a woman or man, as well as their rights to life, liberty, and security from personal violence, and the breach thereof by a second marriage, or by cohabitation with another woman as a wife, is often more injurious to the feelings of the lawful wife, as well as in other respects, as would be a deprivation of personal security or of personal liberty—more injurious than the shake of a fist, coupled with a threat, or an attempt to commit a bodily injury. * * * The ground upon which the exclusion of the wife or husband rests is that it would destroy confidence and produce discord. A man in the bed of a strange woman is in a very unfavorable situation to insist upon preserving inviolate the sacred concord of marriage and harmony and confidence on the part of his wife.' (*U. S. v. Bassett,* 5 Utah, 136, 13 Pac. 240.)

"With all the respect due to so learned a judge as was Judge Brewer, we think that Mr. Wigmore's characterization of his

opinion in the Bassett case as a piece of 'skillful wordfencing' is a most just one.  This statute never intended that the exception should only apply to cases of assault upon the wife or husband, but it meant to make the spouse competent in all cases where the offense of the other was against the marriage relation.. Why?  Because it would be foolish to exclude the testimony of a spouse, for the sole purpose of protecting the family concord, when the offense for which the other spouse is being tried has broken and shattered that conjugal peace and harmony. That, surely, is the real intent of the exception.

"If this be the proper construction of the exception, the present case is clearly within it.  'Whenever the act or the conduct which constitutes a public offense or crime consists in a direct violation of the rights of an individual, the crime is against that individual, as well as against the public,' is the rule announced by Chief Justice Zane for the determining whether or not the offense is one against the wife.  This rule we believe to be a proper one, and the one by which to determine whether or not the omission to provide for minor children is an offense committed by the husband against the wife.  It was a breach of the husband's obligation to his wife to refuse to support his children.  It was a part of the obligations he assumed when entering into the contract of marriage.  For it is made his duty to support both his wife and their children, when he is able to do so. His casting this burden upon his wife, without lawful excuse, was a breach of his marital obligations.  Who will contend that a husband's failure, when able, to support his children is not an offense against the marriage relation?  Who is more injuriously affected by such conduct than the wife?  The children are not injured so much as she.  For upon his failure to provide for them she must.  The children do not suffer; she is forced to spend her life in labor in order that she might meet the obligations which he has, without cause, thrust upon her.

"Can there be any family peace in such case for the law to protect?  Where is there any conjugal concord, to preserve which in this case this woman's lips should be sealed?  Why should the courts of justice be denied hearing her testimony, when the husband has, through his neglect and abandonment, willfully destroyed the confidence and concord which the purpose of her exclusion is to protect?  In her civil action for maintenance of these children, she was permitted to testify, and practically the same facts she now testifies to.  See section 4978.

Rev. Laws 1910. That, law recognizes that, by his abandonment and failure to furnish the necessities of life, the husband had shattered the peace of the family, and therefore there was no further reason for silencing the wife. That family peace was not restored by the judgment for alimony, nor was it restored by any subsequent conduct on the part of the defendant. On the contrary, the breach between husband and wife was increased by his neglect. Why, then—what reason in the world is there why this woman should be silenced as to his conduct in this effort to punish him for his neglect of parental and marital duties?

"We respectfully submit that to hold that this woman was incompetent to testify in this case would be but to revert to principles of law originating in sentiment, not in reason, and would be excluding from our courts witnesses whose testimony in many cases is indispensable to the proper determination of the issues, and the only reason which could be given for such exclusion is the preservation of a family peace which the case assumes does not exist. * * *

"We do not believe this court will say that we have so foolish a public policy in Oklahoma that closes the lips of an abandoned and deserted wife, in order that the family harmony and concord which has been utterly destroyed by the husband's acts shall not be further disturbed. The right of the public, upon whom this father would cast his own offspring for support, demands that this woman should be heard; the right of the children whom he would willingly leave in want and neglect demands that she be heard; and her rights, grievously disregarded by him, demand that she be permitted to bear witness against him for his breach of his marital obligations. Surely, any public policy which would deny her the witness stand would be one wholly without reason, wholly contrary to the essential welfare of families, and therefore wholly wrong."

Second. Independent of the views above expressed, the objection to the wife's testimony cannot be sustained in this court. The record shows that her testimony was received without objection on the part of the appellant, and that she was subjected to a rigid cross-examination. The statute giving a husband or wife the privilege of using the testimony of the other at will creates an option, which may be exercised or waived.

The husband, having elected to hear the testimony of his wife, cannot be heard to object after the testimony has been received, and he finds that it is detrimental to his interests. Mr. Wigmore says:

"A failure to object upon the calling of the spouse to the stand must be equivalent to consent." (4 Wigmore on Evidence, p. 3064.)

Third. Counsel for appellant in their brief say:

"This court can search the record from beginning to end, and nowhere in the record is there a word of testimony showing that the plaintiff in error failed to furnish necessary food, clothing, shelter, or medical attendance for the child. Not a single witness has testified to the necessity of the child, or that it was not receiving all the food, clothing, shelter, and medical attendance required."

If this contention were correct, it would engraft a new provision in the statute, and would make a parent's guilt depend, not upon his failure and neglect to provide for his child, but also the concurrent failure and neglect of other persons to do so. In other words, it matters not, though the parent may have done absolutely nothing toward the support of his child, if other persons, through kindness of heart, supplied the child with the necessaries of life, the parent could not be convicted. We cannot agree with counsel for appellant that the fact that the mother and the grandparents of the child were providing it with food and clothing constitutes any justification of the conduct of the appellant. Men cannot shift their burdens upon the shoulders of others in this way. The father, who has brought life into this world, must make a manly effort to support it, and if he does not do so he is guilty under the law.

This question was properly submitted to the jury, and we think the evidence amply sustains the verdict. The fact that the appellant may not have been able to get the kind of employment he desired did not relieve him of the responsibility to support his child. But few parents are able to support their families with easy jobs. The battle of life is no silk-stocking,

kid-glove affair; but it is an earnest, serious contest. A true man, if he cannot get the kind of work which he wants, will do any kind of work he can get which will enable him to support himself and those dependent upon him, and if he will not do this he is not entitled to public sympathy and respect.

The principles of law involved in this case meet with our entire approval. The only objection which we have to the statute is that we think the offense should be made a felony, and not a misdemeanor. The other errors complained of are not supported by the record, or are not material.

Judgment of lower court is in all things affirmed.

ARMSTRONG, P. J., and DOYLE, J., concur.