## EUGENE LIVELY v. STATE.

No. A-3761.   Opinion Filed Dec. 16, 1922.
(211 Pac. 92.)

(Syllabus.)

1.   Homicide—Evidence Insufficient to Sustain Conviction.   The evidence examined, and found insufficient to support the verdict, when considered in connection with the other irregularities mentioned in the opinion.

2.   Trial—Jurors Permitted to Indulge in Recreation.   Where jurors before final submission in long and tedious criminal trials are

kept together in charge of a bailiff, the jurors may be permit-
ted to take open air exercise and indulge in any innocent re-
creation or amusement during the recess of the court, if kept
free from all influence that may tend to interfere with a dis-
passionate consideration of the issues.

3.    Same—New Trial on Ground of Permitting Jury to Attend
Public Gathering Calculated to Arouse Prejudices. Jurors should
not be permitted to attend public gatherings where the speak-
ing or exhibition has a tendency to arouse the passions or pre-
judices of the jurors, or where they may be subjected to pre-
judicial extraneous influences.

(a)    As a general rule a new trial will not be granted on such
ground alone, where no actual prejudice is apparent.

Appeal from District Court, Coal County; J. H. Line-
baugh, Judge.

Eugene Lively was convicted of murder, and he appeals.
Reversed.

P. E. Wilhelm and J. G. Ralls, for plaintiff in error.

The Attorney General, for the State.

BESSEY, J.  The plaintiff in error, Eugene Lively, in this
opinion referred to as the defendant, on the 27th day of Sep-
tember, 1919, was found guilty of murder, and his punish-
ment was assessed at imprisonment for life in the state pen-
itentiary.  The defendant was charged with the murder of
Ed Welborn on the 22d day of July, 1918.

The evidence shows that previous to the killing of Wel-
born he and the defendant lived on adjoining farms, about
eight miles north of Coalgate. Both were engaged in farming
and stock raising, and had been close personal friends.  Their
families were friendly and frequently visited with each other.
On Sunday, July 21, 1918, the day prior to the homicide, the
deceased, in company with an automobile mechanic, came to
the home of the defendant and obtained his permission to re-
pair deceased's car at the blacksmith shop belonging to the

defendant, located a short distance from his residence. They worked there several hours and went away about 4 o'clock in the afternoon, deceased returning to his home, where he remained until some time during the forenoon of Monday. He then went to see some neighbors about his threshing, to find out when the threshers would come to his place. He did not return to his home and was not again seen alive by any of his family. A neighbor girl testified that she saw the deceased on horseback some time during the afternoon on Monday about two miles from the spot where the body was found on Wednesday following.

The body of the deceased was found in what was known as the Peeler Beal pasture, about 50 yards from an old road running through the pasture and about the same distance from a creek, surrounded by timber and underbrush. He had been shot twice with a shotgun, once in the neck and shoulder and once in the breast. His horse was found some distance away, where the lariat rope around its neck had become entangled in some brush. The body was discovered by a searching party of neighbors of the deceased, among whom was the defendant. Some of them had been out on Tuesday also looking for the missing man. The body when found was in an advanced stage of decomposition, and with the assistance of a physician a post mortem was held.

There was no direct evidence tending to show that the defendant was anywhere near the place where the body was found at any time before its discovery.

It was the theory of the state that the deceased and the wife of the defendant had sustained illicit relations, and that the defendant for this reason waylaid the deceased and shot him from ambush.

The testimony tending to support this conviction was wholly circumstantial. The record is voluminous, contain-

ing 472 pages, made up largely of the testimony of a great number of witnesses who testified to the size and kind of gun owned by the defendant; the fact that certain kinds of shells had been purchased by him at different times; the identity and ownership of an axe that was afterwards found near the scene of the homicide; and to complaints and conversations had by the defendant and his wife with two witnesses relative to the alleged relations between defendant's wife and the deceased, in which ways and means were discussed or hinted at by which the defendant could, in one way or another, get rid of the deceased.

To recite and analyze this evidence in detail would unnecessarily prolong this opinion, to no good purpose. Suffice it to say that this court has carefully examined the testimony of each and every one of the witnesses, and, assuming that each of the witnesses for the state testified truthfully in every detail, the most that can be said is that the defendant entertained a purpose to bring about the death of the deceased by the aid of the two witnesses who testified concerning conversations had with the defendant and his wife. There was no direct evidence that he ever took any active steps to execute this purpose; on the contrary, the testimony of these two witnesses was to some extent impeached and was of doubtful probative force.

The defendant and his wife were both originally charged with this homicide, but were prosecuted and tried separately. The testimony in this case indicates more strongly that the wife may have fired the fatal shot than that the defendant did. The record is far from conclusive as to the guilt of the defendant, but, on the contrary, indicates that some other person not connected with the Lively family may have committed the crime.

Of the numerous assignments of error urged, but two need be noticed, namely:

First. That the evidence is insufficient to support the verdict.

Second. Misconduct of the jury, to the prejudice of the defendant.

Upon the first assignment of error sufficient has been said to indicate that there is a grave and substantial doubt that the showing made eliminated every reasonable hypothesis other than the guilt of the defendant, or that the crime may have been committed by some other person not connected with the defendant.

In the motion for a new trial a showing was made that after the jury had heard all the evidence and during an intermission in the argument the jury, in charge of the bailiff, without the consent of the defendant, were in the jury box in the courtroom while a mass meeting was in progress in the courtroom, for the purpose of indorsing and ratifying what is commonly known as the "League of Nations"; that one of the special prosecutors in this case was the presiding chairman of this meeting; that numerous speeches were made by those there assembled, including a speech by J. H. Linebaugh, the presiding judge in this case; that the judge and other speakers strongly urged the ratification of the League of Nations; that J. G. Ralls, one of the attorneys for the defendant, entering the courtroom to resume the argument to the jury, was called upon by some one in the meeting for an expression of his opinion upon the questions then under discussion; that Mr. Ralls said as an American citizen he was opposed to any entangling alliances with the kings, monarchs, and rulers of the old countries, and that, if the League of Nations was indorsed, it would mean that the United

States would immediately commence preparations for war on a large scale, and that it would devolve upon the United States and Great Britain to keep the peace of the world; that thereafter the county attorney, who was disqualified to act in the case, reported a resolution and moved its adoption, in which reference was made to those who were opposed to the League of Nations as being pro-German, all of which provoked a heated discussion of these issues in the presence of the jury; that, among other things, the chairman of the meeting, the special prosecutor in this case, stated that on account of the politics of J. G. Ralls it might be expected that he would be opposed to the League of Nations.

It is also shown that at the time this trial was in progress there was a theatrical tent show being conducted in Coalgate, and that it was agreed that the jury, in charge of the bailiff, might attend the show; that for some reason they did not attend this tent show, but did on two nights, Thursday and Friday nights, September 25th and 26th, visit a moving picture show; that on Friday night there were shown court scenes involving the trial of a gypsy girl for the murder of her husband by the administration of poison, the evidence in the case being all circumstantial. There was thrown on the screen during the performance a heavy web-like apparition, funnel-shaped, illustrating how the threads of circumstantial evidence in the case had woven themselves about her, the point of the funnel culminating in the word "Guilty." Extracts of the speeches for the prosecution were thrown upon the screen and were of a highly excitable nature and calculated to place extraordinary stress upon circumstantial evidence and the credence to be accorded such evidence.

So far as the jury's attendance at the moving picture show is concerned, the defendant ordinarily would have no cause for complaint for the reason that his counsel interposed

no objections to the jury's attending a show, though they did not in fact attend the performance contemplated by the defendant. However, in view of the fact that the evidence in this case was wholly circumstantial, we are fearful that an exhibition of the character witnessed, though inadvertently seen, considered in connection with the other circumstances shown, may have operated to the disadvantage of the defendant.

A rule for general application may be stated thus:

"All of the courts no doubt agree that any misconduct on the part of the jurors in a criminal case which was prejudicial to defendant, or any such misconduct on the part of the judge, officer in charge or outsiders, improperly influencing the jurors, not caused or waived by the defendant, is ground for setting aside a conviction and granting a new trial. On the other hand, as a general rule a new trial will not be granted where it clearly appears that defendant has not been injured or prejudiced by the misconduct." 12 Cyc. 717.

Vigilance in preserving inviolate the impartiality of jury trials should be exercised. Jones v. Frank, 62 Okla. 26, 161 Pac. 795; Watson v. State, 7 Okla. Cr. 508, 124 Pac. 329; Ridley v. State, 5 Okla. Cr. 522, 115 Pac. 628; State v. Jeffries, 210 Mo. 302, 109 S. W. 614, 14 Ann. Cas. 524, notes 535; Shaw v. State, 83 Ga. 92, 9 S. E. 768; Wood v. State, 34 Ark. 341, 36 Am. Rep. 13; Babb v. State, 18 Ariz. 505, 163 Pac. 259, Ann. Cas. 1918B, 925.

The practice of furnishing indiscriminate and deversified entertainment to jurors was condemned in Wood v. State, supra. There the bailiff first took the jury to a drug store (?), where they drank whisky. Later he took them to a billiard hall, where they were kept separate from the other players. On Sunday he provided one of the jurors with a clean shirt, and conveyed the panel in a hack five miles into

the country to attend church. The defendant was a lawyer. His defense was that at the time of the homicide he was so drunk as to be incapable of forming a design to kill.

. The old rule that jurors were practically the prisoners of . the court has been relaxed so that jurors in long and tedious trials may be permitted to take open air walks and even indulge in innocent amusements and recreation. It has been held that attending church or theatrical performances may not be prejudicial, but, where the accused is on trial for his life, care should be taken to prevent the jurors' minds from being diverted from the issues involved. Jurors should be impressed with the gravity of their office, and not be permitted to regard their duties as a kind of diversion or pleasant entertainment. Care should be taken to keep the jurors' minds free from the passions or prejudices that may prevail, so that they may concentrate their minds on the true issues involved. The excitement and passions of the people might have no direct relation to the case on trial, and still might be prejudicial. For instance, the deliberations of a jury might be impaired by an adjacent street riot, a destructive fire, or other tragedy in which individual jurors were or might be interested.

The question of indorsing the League of Nations excited bitter controversy among people everywhere. Persons favoring and those opposing it were venomously assailed, and this would have a tendency to affect the opinion these jurors entertained for its proponents or opponents, as the case might be. The motion for a new trial stated that a United States Senator opposing the League of Nations had recently been "rotten-egged" in a neighboring town.

Considering the fact that the trial judge, the acting prosecutor, and other active participants in the trial warmly took

sides in the discussion, such discussions under the circumstances may have tended to create a mental atmosphere among the jury unfavorable to the defendant and his attorney. In the very nature of things, it would be impossible for the defendant to show by evidence just what psychological effect on the minds of the jurors these impressions produced.

The deceased was foully murdered by some person lying in wait. The gruesome circumstances surrounding the finding of the body tended to excite hostile feelings in the minds of the jury. There was no positive evidence that the defendant or any one connected with him was near the scene of the tragedy. The suspicion cast upon defendant emanated from two witnesses whose testimony was far from convincing. Where the facts have been fairly submitted to a jury, resulting in a conviction on purely circumstantial evidence, we would hesitate for that reason alone to disturb the verdict; but where there are irregularities, such as above outlined, which separately and alone might not operate to justify a reversal, a combination of all these conditions may be sufficient to cause a reversal. Considering everything, we are not satisfied that this defendant had such a fair and impartial trial, before an impartial jury, as is contemplated under the Constitution and laws of this state.

The judgment of the trial court is reversed, and the cause remanded.

DOYLE, P. J., concurs.

MATSON, J. (concurring). I concur in the result. The conviction is based solely upon circumstantial evidence. This evidence is not sufficient to exclude every reasonable hypothesis other than that of the guilt of defendant. For that reason, the verdict is contrary to the law and the evidence, and a new trial should follow as a matter of justice and right.

The alleged misconduct of the jury at the mass meeting occurred in the presence of the trial judge. Nothing was said or done at that meeting that had any bearing upon the trial. The trial judge so found, and, after a careful examination of the record, I am convinced that such ruling did not amount to an abuse of judicial discretion on his part. If the remarks of defendant's counsel at the mass meeting had a tendency to prejudice him before the jury, any such alleged error was invited.

The record shows that the jury was permitted to attend the picture show by consent of defendant's counsel. I think that counsel should not be permitted to consent in the trial court, and by such consent create a situation which is claimed to be prejudicial when the cause reaches the appellate court. There is no showing that the jurors were permitted to separate at any time after they were sworn to try the cause, nor were they communicated with by anybody on any matter connected with the trial.

I do not want to be understood as commending the practice of permitting juries to attend picture shows or other theatrical performances, or even public mass meetings, during criminal trials. I think such practice should be condemned, but in the instant case I believe there is no showing of misconduct on the part of the jury sufficiently prejudicial to defendant to constitute an abuse of discretion by the trial judge in overruling the motion for a new trial.

For that reason, I think the judgment should be reversed solely upon the ground that the verdict is contrary to both the law and the evidence.