IRVIN C. BERNELL v. STATE.

No. A-9920.   March 4, 1942.

(123 P. 2d 289.)

Jerome Sullivan and Travis Bonner, both of Duncan, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

JONES, J. The defendant, Irvin Bernell, was charged in the district court of Stephens county with the crime of murder, was tried, convicted, and sentenced to life imprisonment in the State Penitentiary, and has appealed. The charging part of the information filed against the defendant reads as follows:

"That the said Irvin C. Bernell, late of Stephens County, Oklahoma, and within the jurisdiction of this Court, then and there being, did then and there willfully, unlawfully, wrongfully and feloniously, without authority of law and with a premeditated design to effect the death of Hazel Bernell, Ruby Barkley and Earl Barkley, make an assault in and upon the said Hazel Bernell, Ruby Barkley and Earl Barkley, with a certain weapon, being a .32 automatic pistol loaded with powder and bullets then and there had and held in the hands of him, the said Irvin C. Bernell, and did then and there with the said firearm and weapon so had and held as aforesaid, willfully, unlawfully, wrongfully and feloniously and without authority of law and with a premeditated design to effect the death of the said Hazel Bernell, Ruby Barkley and Earl Barkley, fire, shoot and discharge the said firearm, pistol and weapon at, into and upon the head and person of the said Ruby Barkley, then and there and thereby inflicting a certain mortal wound in and upon the head and body of the said Ruby Barkley of which said mortal wound so inflicted as aforesaid, the said Ruby Barkley did, on the 30th day of November, 1939, die, as was intended by the said Irvin C. Bernell, that she should so do, with the unlawful, wrongful and felonious intent then and there on the part of him, the said Irvin C. Bernell, to kill and murder the said Ruby Barkley, contrary to the form of the statutes, in such cases made and provided, and against the peace and dignity of the state of Oklahoma."

It is first contended that the evidence is insufficient to support the verdict. Although counsel for defendant make this contention, such assignment is wholly without merit. The testimony of all of the witnesses, except that of the defendant himself, shows a cold-blooded and ruthless killing, by the defendant, of two people. The defendant killed Earl and Ruby Barkley, man and wife, on November 30, 1939, in the city of Duncan. This conviction arose from the killing of Ruby Barkley.

Earl Barkley was a brother-in-law of the defendant. The defendant had married Hazel Barkley on March 8, 1934. Two children were born and living with their mother at the time of this tragedy. A few months after the marriage of the defendant, he was convicted of second degree burglary and sentenced to the Granite Reformatory for two years. He was paroled by the Governor in 1935 and lived with his wife from that date until 1939 at Edmond and El Reno. In the fall of 1939 the wife of the defendant went to Duncan with her two children and commenced living with her brothers, Earl and Floyd Barkley, and her mother. The defendant testified that the Barkley boys talked his wife into leaving him because he was an ex-convict. It was the contention of the state, as testified to by members of the Barkley family and others, that the defendant was gambling and going with other women; that he had mistreated his wife by refusing to support her and had struck and mistreated her so badly that she had written her brothers to come to El Reno after her.

Hazel Bernell discussed with an attorney at Duncan the advisibility of instituting a divorce action against the defendant. A waiver of summons was prepared and mailed to the defendant for signing. The defendant had made a settlement for a personal injury he had sustained.

He took this money, went to Duncan and rented a room where he and his wife lived until two days before the shooting, at which time, trouble having arisen between them, she went back to her mother's.

The killing occurred shortly after midnight, November 29, 1939. Earl Barkley and Ruby Barkley, the two deceased persons, together with Tom Bailey and Flora Bailey, a brother and sister of the deceased Ruby Barkley, were in the city of Duncan that night, as was the defendant. Flora Bailey and Hazel Bernell, wife of the defendant, were employed as waitresses at the Snow White Inn. Mrs. Bernell worked at this inn until about midnight. The defendant had called his wife over the telephone from a downtown cafe during the evening. Disinterested parties who heard the conversation testified that the defendant used vile and profane language in talking to his wife and threatened "to come down there and stack the furniture." His language became so foul and loud that the owner of the cafe intervened and stopped the conversation.

The defendant called Earl Barkley and had a conversation with him at a cafe concerning the strained relations existing between the defendant and his wife. Their conversation appeared to be friendly and the defendant testified that Earl promised to try to get his wife to go back to him.

At the time Hazel Bernell quit working at the inn, she was met by Tom and Flora Bailey and Earl and Ruby Barkley in Tom Bailey's automobile and driven downtown to near Story's cafe. There they met the defendant, who talked some with his wife in the presence of all the parties and then took her off, away from the automobile, where they talked several minutes in private. When Hazel Bernell returned to the automobile she was crying. The

defendant came along by the automobile shortly thereafter and was accosted by Earl Barkley, who asked the defendant the following question: "You didn't hit her, did you, boy?" Bernell denied striking his wife and got in the automobile to talk to her. At that time Tom Bailey was sitting under the wheel, Flora Bailey was in the middle and George Smith was on the right side in the front seat. In the rear seat, Earl Barkley was sitting on the right, Ruby Barkley in the middle and Mrs. Bernell on the left. The defendant opened the door next to his wife and spoke to his wife about going home. The wife refused to go with the defendant, and Bernell then wanted her to kiss him, but she refused. Defendant then jumped out of the car exclaiming, "I will get a gun and blow my damn brains out," and ran to a trash can on the sidewalk a few feet away from the car and procured a gun. When defendant left the car the driver started the engine and commenced to back from the curb. The defendant ran towards the car as it was backing from the curb and fired three times. The first shot struck Ruby Barkley in the head, killing her instantly. One of the other shots struck the side of the car. When the shooting started, Earl Barkley climbed out of the car and started around the rear of the car towards the defendant. Two more shots were fired by the defendant, one of them striking Earl Barkley in the stomach, resulting in his death a few hours later.

The state also introduced evidence showing that the defendant had bought a .32 caliber automatic pistol a few days before the shooting and was carrying it on his person the night of the altercation. There were many other circumstances testified to by witnesses for the state which clearly show an unjustifiable homicide.

The defendant, in his own behalf, testified to substantially the same facts as above outlined, except as to

the occurrence just preceding and at the time of the fatal shooting. Defendant stated that while they were sitting in the automobile he asked his wife to kiss him goodnight; that Earl Barkley then started cursing him and said, "I have got to finish the son-of-a-bitch some time and I about as well do it now"; that defendant jumped out of the car and started running east on the sidewalk; that he saw Earl Barkley get out of the east door of the car and start toward him; that he then ran to the trash can, got his gun and started shooting at Earl Barkley; that he was trying to defend his life because Barkley was coming toward him; that he did not know Ruby Barkley had been shot until the county attorney was questioning him several hours later.

The defendant further testified, which testimony was corroborated by other witnesses, that a few days before the killing he and his wife went to the city jail where Earl and Floyd Barkley had been incarcerated for being drunk. That when the Barkley brothers saw him they cursed him and said they were going to whip him; that defendant talked to Officer Stewart about the threats they had made and asked the officer what he was supposed to do, and that the officer told him that every man had a right "to protect himself"; that he then went up to the pawnship and bought the pistol and carried this pistol to protect himself from the Barkley boys; that he and his wife continued to live at a room they had in Duncan until two nights prior to the shooting, when she went out to her brothers; that on the night of the shooting he called his wife over the telephone three times endeavoring to find out why she did not return; that he hid the pistol in the trash can to prevent policemen from finding it in his possession, which might have caused his parole to be revoked.

Although the defendant's testimony showed that he was relying upon the theory of self-defense as a defense to this charge, there was some testimony by the defendant to the effect that the conduct of the Barkley boys in talking his wife into leaving him and in threatening his life had made him very nervous and had upset him mentally.

It would be tedious and serve no useful purpose in the disposition of this cause to detail the substance of the testimony of each of the witnesses. The state used several eyewitnesses, many of them disinterested, who showed that the defendant fired into this automobile as it was backing from the curb. The defendant's own statement as to the facts provoking the shooting is contradicted by the physical facts. The state's witnesses testified that Earl Barkley did not get out of the automobile until the shooting had commenced. If Earl Barkley had gotten out of the car at the time the defendant did and started toward him, as testified to by the defendant, the deceased Ruby Barkley would not have been in the line of fire.

It is sufficient to say that the testimony of the defendant merely raised an issue of fact for the determination of the jury, which, acting under proper instructions of the court, has been determined adversely to the defendant. Under the decisions of this court, such a finding will not be disturbed upon appeal when supported by substantial evidence.

The defendant next contends that the court committed error in sustaining objections interposed by the county attorney to questions asked the defendant calling for conversation with his wife.

Several times during the period when the defendant was upon the witness stand he would tell of meetings he had had with his wife. He would then be asked this, or a similar question: "Did she communicate any threats to

you that her brothers * * *" Here the county attorney objected to testimony of any communications made by the wife of the defendant to him, which objection was sustained.

Later, during the examination when a similar question arose, the county attorney made this objection: "We object to that unless the defendant and his counsel will waive any objection they might have under the law of Hazel Bernell taking the witness stand." To which the court stated: "I will permit the wife to be called if you insist on him answering." After which the following transpired:

"Mr. Sullivan: The defendant, by his counsel, now states that he absolutely and unqualifiedly is not waiving any rights of his wife to testify against him in this trial, and we want it specifically understood by the court and the counsel for the state. By the Court: Let the objections be sustained to all evidence offered concerning any conversation with the wife and counsel admonished not to ask the defendant any questions which involves conversation with his wife."

Section 3069, O. S. 1931, 22 O. S. 1941 § 702, provides, in part, that the husband or wife "* * * shall in no event on a criminal trial be permitted to disclose communications made by one to the other except on a trial of an offense committed by one against the other."      .

In Steeley v. State, 17 Okla. Cr. 252, 187 P. 821, the defendant was charged with murder and the defense was insanity. It was therein held:

"Under section 5882, Rev. Laws 1910, 22 O. S. 1941 § 702, providing that neither husband nor wife shall in any case be a witness against the other, and that neither 'shall in any event on a criminal trial be permitted to disclose communications made by one to the other except on a trial of an offense committed by one against the other,' the defendant, in a prosecution for killing his

wife's paramour, is incompetent as a witness to disclose communications made by his wife to him."

Construing the same section of the statute in the case of Tingley v. State, 16 Okla. Cr. 639, 184 P. 599, 602, it is said:

"In this case, the defendant was charged with the murder of one W. H. Overholser, clearly not a crime against his wife, or one necessarily involving the marital relation. The wife was not charged with any crime at all, and was on trial for no offense. She would not have been a competent witness in this trial against her husband as to any communications made by him concerning his relations with Nell Martin. It is obvious that under the provisions of the foregoing statute he was incompetent also to testify to these alleged communications between him and his wife, and this though the issue of insanity was presented."

The defendant further assigns as error the action of the county attorney in calling the wife of the defendant to testify and causing the defendant to object to her competency in the presence of the jury. The objection of the defendant was sustained and the wife was not permitted to testify.

It has been held that when the defendant fails to object to his wife testifying against him, he waives the objection and may not present such question on appeal. Hunter v. State, 10 Okla. Cr. 119, 134 P. 1134, L.R.A. 1915A, 564, Ann. Cas. 1916A, 612; Carr v. State, 22 Okla. Cr. 371, 211 P. 423.

In this case, if the defendant had not objected to his wife testifying he would have been considered by this court as having waived the privilege.

As was stated in Allen v. State, 35 Okla. Cr. 64, 248 P. 655, 656:

"But the privilege of a husband charged with rape to have the testimony of his wife excluded is a privilege

or right which may be waived. Wigmore on Evidence, § 2242; notes, Ann. Cas. 1913A, 31. And the right to have the wife's testimony excluded is waived where the husband takes the stand and testifies to conversations had with his wife pertinent to the issue. The state may then cross-examine the defendant witness concerning such conversations and may use the wife as a rebuttal witness. The right to controvert competent evidence by cross-examination or in rebuttal is a right which cannot be abridged, within the scope of the original inquiry. 40 Cyc. 2473 et seq.; 7 Words and Phrases, p. 5987; 4 Words and Phrases, Second Series, p. 197.

"If the defendant wished to avail himself of the benefits of a privileged communication, he should himself have refrained from opening up the subject of that privilege. It would be contrary to reason and authority to permit one to waive such privilege and later avail himself of the privilege by objecting to a fuller development of the facts on rebuttal."

A reading of the information hereinabove quoted shows that the county attorney alleges an assault made upon Earl Barkley, Hazel Bernell, wife of the defendant, and Ruby Barkley. It was evidently his theory that, since he had alleged an assault upon the wife of the defendant, in which Ruby Barkley was killed, the wife would be a competent witness under the exception to the rule that the wife may testify against her husband on the trial of offense committed by himself against her.

Lastly, it is urged that the jury was guilty of misconduct for the reason that on the night of February 20, 1940, while the trial was in progress, the bailiffs in charge of the jury took the jury to a picture show to see a picture entitled "The Invisible Stripe." This question was presented on the motion for a new trial and two witnesses were called by counsel for defendant to testify concerning this show. One of them testified that the picture was a western picture and was more of horse racing

than anything else, but he remembered very little about the details of the picture. The operator of the picture show testified in detail about the picture where the plot concerned an ex-convict who was trying to go straight. Both men testified that they did not think there was anything about the picture which would have prejudiced the defendant.

It is a dangerous practice for jurors to be allowed to attend motion picture shows unless the bailiffs in charge of the jury know ahead of time the nature of the picture to be seen so that they may know whether it might have any influence upon the case which is being tried. The rule is stated in Lively v. State, 22 Okla. Cr. 271, 211 P. 92:

"Where jurors before final submission in long and tedious criminal trials are kept together in charge of a bailiff, the jurors may be permitted to take open air exercise and indulge in any innocent recreation or amusement during the recess of the court, if kept free from all influence that may tend to interfere with a dispassionate consideration of the issues.

"Jurors should not be permitted to attend public gatherings where the speaking or exhibition has a tendency to arouse the passions or prejudices of the jurors, or where they may be subjected to prejudicial extraneous influences."

We do not think that the showing made on the motion for a new trial is sufficient to sustain this contention, especially in view of the facts established by the state overwhelmingly showing the guilt of the defendant.

This being a capital case with a term of life imprisonment confronting the defendant, we have given it that careful consideration which the law requires and justice demands. The instructions given were probably more favorable to defendant than the law requires and

104

no complaint is made of any of the instructions. We can find no error or irregularity in the proceedings of sufficient importance to require a reversal of this case. The judgment of the district court of Stephens county is, accordingly, affirmed.

BAREFOOT, P. J., and DOYLE, J., concur.