## HEINDEL v. UNITED STATES.
### ROGERS v. SAME.
#### Nos. 9809, 9810.

Circuit Court of Appeals, Sixth Circuit.

July 16, 1945.

---

single trial, convicted and sentenced for attempting to defeat and evade income and excess profits taxes of the Cincinnati Lathe & Tool Company, a corporation, of which they were officers and employees, by swearing to and filing a false return of the net income of that corporation for the calendar year 1940. They were also charged, convicted, and sentenced for conspiring in an attempt to defeat and evade such taxes.

It is disclosed by the evidence that the Cincinnati Lathe & Tool Company was incorporated in 1906, that appellant Heindel owned 248 of its 250 shares and appellant Rogers one share, the remaining share being held by a party not here involved. The company was small and had very little business from the date of its incorporation up to 1939. Its office force consisted of Heindel, Miss Rogers, a stenographer and typist by the name of Lucille Burdick, and a telephone operator. In November, 1939, however, the company received substantial orders from the French Purchasing Commission and the Selson Machine Tool Company of London, England, for the production of lathes. Practically all of its business during 1940 and part of 1941 consisted of the production of machine tools in pursuance of such contracts. The French Commission advanced the company the sum of $54,000, being an amount equal to 25% of the contract price on standard machines and 100% on special equipment. This sum was deposited by the company to its own credit in a special account with the First National Bank of Cincinnati, Ohio. Similarly, a 10% advance payment was made to the company by the Selson Machine Tool Company. This was in the amount of $29,384, and was likewise deposited in a special account to the credit of the company with the Central Trust Company of Cincinnati. An additional 10% advance, after three months, was also deposited in this special account. When the first four shipments were made on account of the French order, invoices were in the gross amount with credit for advances, and checks were drawn on the special deposits at the First National Bank for the proportion of the advance payment, applicable to each order, and credited to the company's regular account at the Brighton bank. A similar course was followed with respect to the earlier shipments on the British order. On subsequent shipments, however, the proper cross-entries were not made bringing over the

Robert S. Marx, of Cincinnati, Ohio (Francis A. Hoover, Nichols Wood, Marx & Ginter, and Harry Kasfir, all of Cincinnati, Ohio, on the brief), for appellants.

Ernest R. Mortenson, of Washington, D. C. (Samuel O. Clark, Jr., Sewall Key, J. Louis Monarch, and Walter M. Campbell, Jr., all of Washington, D. C., and Byron Harlan and Robert E. Marshall, both of Cincinnati, Ohio, on the brief), for the United States.

Before SIMONS, HAMILTON, and MARTIN, Circuit Judges.

SIMONS, Circuit Judge.

While there were two appeals the appellants had been jointly indicted and, in a

amount of the advance payments after the orders were shipped. Invoices were drawn for the net balance due and drafts for that amount were presented and paid by the purchasing commissions. It resulted, therefore, that the books erroneously failed to reflect the full amount of the sales.

In the preparation of the company's 1940 income and excess profits return the appellants, on behalf of the corporation, employed a public accountant and tax consultant by the name of Horner, who was shown a trial balance sheet furnished him by Heindel but which had been prepared by Miss Rogers. Finding this sheet out of balance, he examined the general ledger and certain sheets of the loose-leaf cash journal pertaining to the closing entries for the year, and after directing some corrections, prepared the return. There is some conflict in the evidence as to whether Horner was employed to make a general audit of the corporation's books or merely to make the closing entries and prepare the return. His bills would seem to show that he made an audit, but the fee charged and paid would not so indicate. In any event, he accepted the sales figure of $366,084.19 as given him, without any attempt at verification. He did not see the invoice ledger, had no knowledge of the existence of the special accounts at the First National Bank or Central Trust Company, and was not shown either the French or British contract. The return as prepared by him was signed and sworn to by the appellants, filed with the collector, and the tax shown to be due thereon was paid.

On December 29, 1941, a government agent was assigned to audit the books of the corporation, and very soon discovered from record references therein, the existence of the special accounts. Upon calling the attention of the appellants to what he had found, Heindel immediately employed another certified public accountant to go over the books and prepare an amended return. This showed the corporation's gross sales for the tax year to have been $461,279.09, and also revealed that an additional sum of $30,255.59 was due in taxes for that year. The amended return having been introduced in evidence, the appellants offered to show that the additional taxes were promptly paid, but this evidence was, upon objection to it as immaterial, excluded. Two years later the appellants were indicted for attempted evasion of the corporation's tax liability.

The correctness of the amended return is not disputed. It is thereby established that the corporation's gross sales in the tax year were in the original return understated by $95,194.90. The defense was that this was due to poor bookkeeping and not to any wilful or felonious intent to deprive the government of revenue. Heindel was 68 years of age, a resident of Cincinnati during his entire lifetime with an unquestioned reputation for honesty and integrity. For 8 years he had been in the employ of the Cincinnati Milling Machine Company with 4 years of that time in the shop and 4 years in the office. He was not a trained bookkeeper, although he had had some little experience with books. After founding the Cincinnati Lathe & Tool Company in 1906, most of his time was given to the manufacture of machine tools made by that corporation. Miss Rogers was 52 years of age and had come to the corporation as a stenographer in 1914. She had never studied bookkeeping but when the company did not have enough work to employ a regular bookkeeper she looked after the books. Lucille Burdick was first employed by the company in 1928 as a stenographer-typist and in general office work. She took care of the correspondence, entered orders as received, and made out invoices. It is pointed out that there was no concealment of the special deposits and that the earlier invoices reflected the credits due to each purchasing commission by reason of its advances. Miss Burdick testified that the reason for not showing such credits on later invoices was a request from the French Purchasing Commission that invoices be made for the net amount in order to correspond with the amount shown to be due on the draft. The invoice amount was then carried into the journal and the ledger account, and the corporation did not, at any time, withdraw any part of the advance payment applicable to the shipment. The same practice was thereafter followed with respect to shipments on the British contract. When Horner prepared the original income tax return, the appellants assumed that it correctly reflected the income of the company. He had found substantial errors in the trial balance sheets and had directed corrections to be made upon the books. One such correction revealed an overstatement of cash on hand of approximately $18,000. If he had then checked the journal to ascertain the exact amount, it would have revealed to him

the special accounts and the fact that those special accounts, through error, had not been reflected in the company's records. In any event, Horner rendered bills for services during January for an "audit of journal entries and trial balance preparatory to closing books and setting up adjustments for end of year closing," and again in February "for services rendered, 'closing books and preparing corporation income tax and excess profits tax returns'." The return as prepared by Horner, however, showed gross sales in the amount of $366,084.19, which was the amount shown by the ledger and did not reflect the advance payments which were in the company's account but had not been transferred from its special accounts into its regular account. The appellants signed the return without examining it.

■ Upon this evidence an issue was framed for submission to the jury as to whether the appellants had knowingly and wilfully understated the corporation's net income with an intent to evade a substantial portion of its taxes, and whether the appellants had conspired, each with the other, to attempt to do so. The evidence, while circumstantial, is undoubtedly sufficient to sustain the verdict, and we may dismiss, without argument, the contention that the evidence fails to prove beyond a reasonable doubt that the appellants were guilty of a felonious and wilful intent to evade taxes or conspiring to do so. It is not our function to invade the province of the jury and decide issues of fact.

■ The substantial claim of error made in the briefs and argued to us at the hearing has given us great concern. It relates to an instruction given to the jury that "by the filing of the amended return the defendants have admitted that the original return was false and untrue." The full paragraph in which this instruction appears is set forth in the margin.[1] Concededly it is necessary, in order to determine its possible effect, to consider the entire charge. Much of it is a correct statement of the law, clearly phrased. The jury is instructed that it must take the law from the court, but that it is the sole judge of the evidence. It is instructed "that any person who wilfully attempts in any manner to evade or defeat any tax" is punishable under section 145(b) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev. Code, § 145(b), but that the gist of the offense is the wilful attempt on the part of the defendants to evade or defeat a part of the income and declared value excess profits taxes alleged to be due to the United States; that among the various means that might be used in such an attempt is the filing of a false return with the intent, by so doing, to defeat the tax or a part thereof. It is instructed that the attempt must be wilful and intentionally and designedly made, with a purpose to do wrong; that even though the jury should believe from the evidence that the return was incorrect but that the defendants acted in good faith in making it, believing that it truly reflected the corporation's income, they are not guilty of the offense charged, and further, that mere negligence or carelessness unaccompanied by bad faith cannot render them guilty. The offense of conspiracy is also correctly defined and distinguished from the substantive offense.

Had the court stopped there it is clear that no objection could reasonably have been made to its instructions upon the law. The court then proceeds, however, to announce that the law permits it to

---

[1] "Now, the law permits the Court to comment on the evidence. As I have stated before, the defendants here are charged in two counts. The first count is, that they evaded income taxes and the second count charges them with a conspiracy in attempting to evade those taxes. By the filing of the amended return, the defendants have admitted that the original return was false and untrue. In the original return filed, the gross sales were listed at $366,084.19. After the government had investigated the return of the defendants, the defendants filed an amended return, showing the gross sales were $461,279.09, which was an understatement of sales of $95,194.90. So that, the defendants have admitted filing a false return in the first instance. So, the issue there narrows itself as to whether or not the defendants knowingly and wilfully filed that return knowing it to be false and fraudulent. That's the issue in this case as to the first count. The issue in the second count is, as to whether or not these two defendants, William C. Heïndel and Mary E. Rogers, conspired and worked out this scheme to falsify the books so that they failed to show the true sales, or, falsified the books to the extent that the sales were under stated on the books to the extent of $95,194.90. That's the issue in this case as to the second count. Did they intend to defraud the government?"

comment upon the evidence, and in such comment appears the statement above recited, made and repeated. It is quite true that it is followed by language that narrows the issue to an inquiry, "whether or not the defendants knowingly and wilfully filed that return knowing it to be false and fraudulent," concluding with the rhetorical question "Did they intend to defraud the government?" The term "false," however, both in legal significance and common parlance, denotes an intentional, deliberate, and wilful untruth, something beyond mere inaccuracy. Third Nat. Bank v. Schatten, 6 Cir., 81 F.2d 538; Fouts v. State, 113 Ohio St. 450, 149 N.E. 551; Ratterman v. Ingalls, 48 Ohio St. 468, 28 N.E. 168; State v. Brady, 100 Iowa 191, 69 N.W. 290, 36 L.R.A. 693, 62 Am.St.Rep. 560. Standing alone and divorced from its context, the challenged statement is, beyond question, erroneous and so prejudicial as to require remand for new trial. So much the government appears to concede. It argues, however, that the objectionable language was so immediately followed by instructions submitting the issue of intent and wilfulness to the jury that it was "shorn of any possible prejudicial overtones."

■ We do not lend an attentive ear to insignificant claims of error in a court's instructions to the jury that perhaps prevailed in an earlier day when every slip was fatal, and are reluctant now to reverse upon an erroneous instruction in a charge otherwise so commendable. It is impossible, however, by approval to stigmatize the many thousands of taxpayers who file amended returns as persons admitting, by such filing, that their original returns were "false and untrue." While the effect of an observation may not adequately be appraised when torn from its context, nevertheless it is the very tendency to do so that is to be guarded against. The tax laws permit the filing of amended returns to correct errors whether discovered by the taxpayer or the taxing authority. There should be no discouragement to the filing of an amended return, and no hazard in doing so. The present error becomes more glaring upon repetition, particularly when coupled with an instruction which appears to assume that the defendants "conspired and worked out this scheme to falsify the books so that they failed to show the true sales," as though it were a scheme that, beyond peradventure,

had been established and not merely alleged and controverted. In any event, the issue being a close one, we are unable to say that the attention of the jury was not so focused upon an admission of guilt pointed to by the court, as an established fact, that the court's more formal statements of law would serve to remove the erroneous impression that such fact would tend to implant into the collective mind of the jury.

While the case is much closer than Brink v. United States, 6 Cir., 148 F.2d 325, yet the principle there applied must here prevail. We have recently been told that "Lines are not the worse for being narrow if they are drawn on rational considerations." 10 East 40th St. Building, Inc., v. Callus et al., 65 S.Ct. 1227, 1230. We find such rational considerations to be here controlling.

■ Since the case must be retried it is necessary to add that the court should have admitted evidence of the prompt payment of the additional tax shown by the amended return. The issue framed was in respect to the good faith of the defendants in the payment of taxes. There were circumstances which bore both on their honest purpose and upon their lack of it. Final determination rested with the jury and the defendants were entitled to whatever inference might reasonably be drawn from the fact that as soon as the error was discovered and confirmed they paid their taxes. This is not a case where, by payment, it is sought to vitiate a crime. Hancey v. United States, 10 Cir., 108 F.2d 835; Weinhandler v. United States, 2 Cir., 20 F.2d 359. There was no persistent denial of the error as in Emmich v. United States, 6 Cir., 298 F. 5. The defendants were entitled to show anything that might have a tendency to demonstrate, however slight such demonstration might be, that they were honest and not dishonest persons in their dealings with the government. It is to be noted that at the time the additional tax was paid the appellants were not under compulsion, attributable to an assertion of deficiency, distraint, or threat of prosecution. Indeed, the government did not seek indictment until approximately two years after discovery of the error. The government urges that the fact of payment was already in evidence by the Cashier's stamp upon the amended return, and so the exclusion was without prejudice. It is not disclosed, how-

ever, that this stamp was called to the attention of the jury, and the government's argument on this score but brings into bold relief the error in excluding oral evidence of payment.

Reversed and remanded for new trial.

MARTIN, Circuit Judge (dissenting).

I think the evidence in this criminal case abundantly supports the verdict of the jury that the defendants are guilty of the offense charged. To my thinking, moreover, the verdict was responsive to a clear and correct charge that, to justify conviction, the jury must find from the evidence beyond a reasonable doubt that the defendants designedly and with the purpose of wrongdoing wilfully attempted to evade payment of lawful taxes by purposely failing to report in the return all income which they knew the corporation had received during the calendar year involved. The necessity that the Government prove a wilful attempt to evade was stressed over and over again in the charge.

While it might have been more euphonious had the district judge said that the defendants had admitted that the original return was "incorrect," rather than "false and untrue," he was nonetheless, as I view it, correct in his statement. These words in some settings carry sinister significance; wherein consider, "as false as Cressid," "false as dicers' oaths." In other contexts the words carry no such evil connotation; as, for instance, "a false premise" in logic. The word "false" may mean merely "erroneous, incorrect," as well as "deceptive." See Fowler's American Oxford Dictionary, p. 294. Cf. The New Century Dictionary, Vol. I, p. 547; The Shorter Oxford English Dictionary, 1939 Reprint, Vol. I, p. 672. Some current periodicals have even made popular the indoor game of underscoring answers to assertions of this sort: "Thomas Jefferson was the author of the Declaration of American Independence. True? False?" "After eating Welsh rarebits, a giraffe talks in his sleep. True? False?"

It seems to me unreasonable to infer from the entire context of the charge that the jury could possibly have misunderstood the sense in which the District Judge used the words "false and untrue" in the paragraph of the charge upon which reversal is based.

Nor do I think that reversible error inheres in the rejection of the proffered evidence of prompt payment of the additional tax shown by the amended return. In my judgment, the failure to admit this evidence was, at most, mere harmless error; but inasmuch as the case must be retried, I join my colleagues in the thought that it would be fairer to the defendants to receive it upon the second trial of the case. Yet, prompt payment of the correct tax, after the amended return was filed as a result of the Government's investigation, would not exculpate the defendants from the charge laid in the indictment.