## UNITED STATES v. STOEHR.

### No. 10564.

United States Court of Appeals,
Third Circuit.

Argued Jan. 24, 1952.

Decided April 25, 1952.

Charles J. Margiotti, Pittsburgh, Pa. (Margiotti & Casey, Pittsburgh, on the brief), for appellant.

Arthur A. Maguire, U. S. Atty., Scranton, Pa. (Joseph P. Brennan, Asst. U. S. Atty., Scranton, Pa., on the brief), for appellee.

Before KALODNER and STALEY, Circuit Judges, and STEWART, District Judge.

STALEY, Circuit Judge.

Defendant was indicted for wilfully and knowingly attempting to evade a large part of his income taxes for the years 1943, 1944, and 1945, in violation of Section 145(b) of the Internal Revenue Code, 26 U.S.C. § 145(b). After a trial consuming 17 court days, the jury returned a verdict of guilty on all three counts, and defendant has appealed from the judgment and sentence.

During the period covered by the indictment, defendant was the sole owner and proprietor of a large, retail household furnishings store in Scranton, Pa. His former office manager, August W. Tross, was the key government witness. Tross testified in detail regarding the scheme for evasion of taxes evolved by defendant and himself. At the end of 1943 or early in 1944, Tross submitted to defendant a profit and loss statement for the year 1943 and, with it, an estimate of the amount of income taxes due. The defendant then decided the amount of taxes he wanted to pay and directed Tross to work out the mechanics of the plan whereby net income could be conveniently "reduced." The plan was not an unusual one: inventory and sales were understated, purchases were overstated, and certain living expenses of defendant were disguised as business expenses. Defend-

ant's original books of entry were apparently at all times accurate, but false entries were made by Tross on ledger cards which were accessible only to defendant and Tross. False financial statements were prepared by Tross on the basis of the false entries and these statements were turned over to Griffiths, a certified public accountant, who prepared defendant's returns. As a result of these manipulations, defendant paid $39,261 in income and victory taxes for the year 1943 instead of $193,547, the actual amount owed. Substantially the same procedure was followed the next two years. For the year 1944, $87,073 in taxes were evaded and for the year 1945, $93,133. At no time during the period covered by the indictment did Griffiths make an independent audit.

Defendant, testifying on his own behalf, asserted that he had never given Tross instructions to falsify his income and that he had no knowledge whatsoever of Tross' manipulations which had conferred upon him such substantial financial benefits. Bookkeeping was Tross' province and on him defendant had placed complete reliance, we are told. Defendant testified that although he signed his income tax returns, he had never analyzed them, having depended entirely on Tross. But defendant admitted that he was the active head of his business and that he devoted all his energies to it. When asked on cross-examination what reason Tross had for conceiving and carrying out such a plan, defendant's only answer was "I don't know."

Defendant sold his business in March 1946. Early in 1947 Griffiths, about to prepare defendant's income tax return for the year 1946, made repeated unsuccessful attempts to secure a balance sheet and a reconciliation of capital account from defendant and from Tross, who continued to keep defendant's books. Becoming suspicious, Griffiths demanded that defendant and Tross meet with him. Several meetings followed, and finally the books were handed over. Griffiths testified that defendant, upon being confronted with the accusation that the 1944 figures were false, admitted his scheme and offered to pay any fee to keep the matter quiet. The next morning

Griffiths reported the matter to a representative of the Bureau of Internal Revenue in Scranton.

■ There was clearly abundant evidence to support the verdict of the jury. It is defendant's contention, however, that prejudicial errors during the course of the trial necessitate the grant of a new trial.

■■ First, defendant asserts that the trial court committed reversible error in restricting the recross-examination of Tross and the cross-examination of Griffiths. Tross was on the stand for 4½ days. During that time he was cross-examined more than extensively and all avenues were thoroughly explored.[1] The restrictions to which defendant objects all occurred near the close of recross-examination. Cross-examination is, of course, a matter of right. Alford v. United States, 1931, 282 U.S. 687, 691–694, 51 S.Ct. 218, 75 L.Ed. 624. The bounds of proper cross-examination, however, must necessarily be within the sound discretion of the trial court. United States v. German-American Vocational League, 3 Cir., 1946, 153 F.2d 860, 865, certiorari denied 329 U.S. 760, 67 S.Ct. 114, 91 L.Ed. 655. This rule can be applied with even greater force to recross-examination. Where new evidence is opened up on redirect examination, the opposing party must be given the right of cross-examination on the new matter, but the privilege of recross-examination as to matters not covered on redirect examination lies within the trial court's discretion. See 6 Wigmore on Evidence § 1897; Faulk v. State, 1933, 47 Ga.App. 804, 171 S.E. 570, 571.

■ The first restriction of recross-examination of Tross to which defendant objects involved questions relative to attempts made by defendant at a meeting allegedly held April 16, 1947, to have Tross submit to Griffiths the balance sheet, reconciliation of capital account, and other information requested by Griffiths. The events of April 1947, which finally led to the discovery by

Griffiths that false financial statements had been submitted to him, were brought out by the prosecution on direct examination, and defense counsel thoroughly cross-examined Tross on this subject. On redirect examination, the matter was not reopened. Whether defense counsel was to be granted the privilege of reopening the subject on recross-examination was a matter within the trial court's discretion, and we do not think it should be disturbed. Moreover, it should be noted that the ruling of the court specifically applied only to two questions asked to which objections were sustained. The ruling was not one excluding a line of questions. See United States v. 3.544 Acres of Land, 3 Cir., 1945, 147 F.2d 596, 601. The trial judge stated that if counsel wanted to develop any particular fact to which government counsel made objection, he would make a specific ruling. But defense counsel did not pursue the matter.

■ A second restriction on the recross-examination of Tross to which our attention is called occurred when Tross was asked whether he had engaged in manipulating the income tax returns of defendant's predecessors prior to 1939. The record reveals that prior to 1939, the date on which defendant purchased his business, Tross had been in the employ of defendant's predecessors. On direct examination, Tross was interrogated only about the years covered by the indictment (1943, 1944, and 1945). On redirect examination, the prosecution was allowed to question Tross about manipulations between 1939 and 1943.[2] In his offer of proof, defense counsel stated that his purpose in developing this evidence was to show that Tross had engaged in manipulating figures for his previous employer without the knowledge of that employer and for the purpose of refuting the inference that Tross had learned to manipulate figures at the request of defendant. In view of the testimony on redirect examination, the court was well within its discretion in sustaining the objection to this question. Even

---

1. The cross-examination of Tross covered 223 pages of the Record and recross-examination 66 pages.

2. This was admitted to show intent by negativing accident or mistake; moreover, the trial judge thought cross-examination of Tross had opened up the door for those years.

if it were asked on cross-examination, it might well have been excluded as collateral and as a matter of defense. See Moyer v. Aetna Life Insurance Co., 3 Cir., 1942, 126 F.2d 141. We fail to see that knowledge as to where and when Tross learned the art of manipulation could have shed any light on the issue before the jury.[3]

On the cross-examination of Griffiths, the trial court sustained objections to questions designed to elicit whether the witness was acquainted with the policy of the Treasury Department as to voluntary disclosure of fraud and whether, on the evening of April 22, Griffiths had advised defendant that he could make a voluntary disclosure and escape criminal prosecution. Defendant, on appeal, contends that this restriction was a serious one in that the excluded line of questioning was designed to test the credibility of witness Griffiths. Defendant's argument assumes that Griffiths deserted his client by not advising him about the Treasury policy and by reporting him to the Bureau of Internal Revenue immediately. From this premise, defendant argues that the jury was entitled to consider whether Griffiths was prejudiced in his testimony because he was attempting to justify his conduct. We fail to see how this line of questioning would have shed any more than infinitesimal light on the credibility of Griffiths. Even if we assume that Griffiths deserted his client, a debatable assumption, it is highly speculative whether this past conduct would have colored his testimony either for or against defendant. The exclusion of questions which have at most a slight bearing on bias and credibility does not constitute reversible error. District of Columbia v. Clawans, 1937, 300 U.S. 617, 632, 57 S.Ct. 660, 81 L.Ed. 843. Moreover, the excluded line of testimony represented an attempt to introduce evidence regarding the Treasury Department policy on voluntary disclosure. There was in fact no voluntary disclosure; whether defendant might have made one and thus become the beneficiary of the Treasury Department's self-imposed administrative limitation [4] was not proper inquiry. Such evidence was not material and would have served only to confuse the jury.

As a second ground for a new trial, defendant contends that the exclusion of his 1946 tax return constituted prejudicial error. This return was offered by defendant both as a part of his own case and also as a basis for recross-examination of Tross. The 1946 return apparently reveals that defendant overpaid his taxes for that year in the amount of $60,000. By way of explanation, the record indicates that on December 31, 1945, an entry was made on the Furniture Sales Ledger Card whereby furniture sales for that year were reduced by $71,000. This had the effect, of course, of understating income by that amount. In accordance with his usual practice, Tross "restored" the $71,000 on January 1, 1946, by making an entry in the credit column of the 1946 Furniture Sales Ledger Card. If defendant had operated his business through the year 1946 and the manipulations of the previous three years had been continued, this $71,000 item no doubt would have been "removed" from Furniture Sales on December 31, 1946, by an entry of like amount in the debit column. But when defendant's business was sold in March 1947, this $71,000 item continued on the books as a real 1946 transaction and taxes were paid

---

3. A third restriction on the recross-examination of Tross which is alleged to constitute prejudicial error involved questions asked of Tross as to whether he knew what a revenue agent's report was and whether any revenue agents had been in defendant's place of business to check the books between 1939 and 1945.

 This line of inquiry was actually covered adequately just a few moments earlier when the witness stated that to the best of his knowledge the returns were never checked in the period of time that he was employed by defendant. The trial court was well within its discretion in closing the door to such repetitious collateral inquiry, especially in view of the fact that Tross had been so thoroughly interrogated both on cross-examination and on recross-examination.

4. See Rothwacks, "Law and Procedure in Criminal Tax Prosecution," 26 Taxes 797, 872 (Sept. 1948); Wenchel, "Tax Frauds and Voluntary Disclosures," 25 Taxes 485 (June 1947).

on it. The record is unclear as to whether this was done by Tross intentionally or inadvertently. Defendant contends that the 1946 return was admissible in that it was of probative value on the question of his intent. Moreover, he asserts that if Tross had been cross-examined with respect to the preparation of the return, defendant might have secured some explanation as to Tross' real motive in manipulating the cards without the knowledge of his employer.

 If defendant's reason for introducing the 1946 return was merely to show the jury that he was honest in his dealing with the government in 1946 so as to negative intent for the years 1943, 1944, and 1945, then we think the 1946 return was properly excluded as lacking any probative value. See United States v. Shapiro, 2 Cir., 1947, 159 F.2d 890, 891, affirmed 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787. If the object, however, was to prove that Tross was a negligent bookkeeper, then this should have been proved by defendant's books and records rather than by the 1946 return, which was a mere computation by a third party, Griffiths, from material Tross submitted. The 1946 return was not relevant for this purpose. The 1946 Furniture Sales Ledger Card was in fact in evidence and clearly showed that the $71,000 item was entered in the credit column as of January 1, 1946, and that there was no subsequent entry "removing" it. Further, the defendant testified on cross-examination that he had overpaid his taxes in 1946. Exclusion of the 1946 return did not constitute prejudicial error.

On July 30, 1948, defendant submitted to the Bureau of Internal Revenue an offer in compromise of his tax liability for 1943, 1944, and 1945. He offered to pay $350,000, in return for a release of "all criminal and/or civil liability" for the years involved.[5] The offer contained a statement that the taxpayer was thereby manifesting his desire to "pay the Government every cent due it." The trial judge ruled that all the above evidence was inadmissible. He also denied defendant's request to charge the jury, "If [they] should find that the defendant has always been willing to pay his taxes in any amount, * * * they may consider this circumstance in his favor in determining whether he had wilfully attempted to evade and defeat payment of his income taxes." Both rulings are assailed as prejudicial error. Defendant asserts that his subsequent conduct is relevant to the issue whether or not he had wilfully attempted to evade his income taxes for the years involved.

 In cases of prosecution for crimes involving fraudulent intent, some courts have displayed increased liberality in admitting evidence of subsequent statements and conduct of defendant. See Heindel v. United States, 6 Cir., 1945, 150 F.2d 493, 497; United States v. Matot, 2 Cir., 1944, 146 F.2d 197, 198; United States v. Wicoff, 7 Cir., 1951, 187 F.2d 886, 890-891.[6] The underlying philosophy prompting this policy is well expressed by the Second Circuit in United States v. Matot, supra, where the court declared that so long as evidence does not confuse the jury, its exclusion merely because of logical remoteness from the issue is always a hazard and is usually undesirable. We agree with this principle. Such a rule of liberality does not, however, render admissible every subsequent self-serving act of the defendant. The trial court, in making its ruling, must consider the circumstances of the individual case. Its inquiry in each instance must be: Is the evidence of defendant's subsequent mental state (which evidence is supplied by the subsequent act) of any probative value in establishing his state of mind at the time of the alleged criminal acts,[7] and if so, does the evidence not unduly entangle the issues or confuse the jury? If the defendant here had promptly filed an amended return and

5. The offer was accompanied by a certified check for $200,000, the payment of the remainder being promised thirty days after acceptance of the offer by the government.

6. See also 6 Wigmore on Evidence § 1732, pp. 103–104. Cf. Barshop v. United States, 5 Cir., 1951, 191 F.2d 286, 291–292, appeal pending; but see United States v. Sullivan, 2 Cir., 1938, 98 F.2d 79, 80.

7. See 6 Wigmore on Evidence § 1732, pp. 103–104.

made payment of the additional sum owed, we think such evidence might very well have been admissible.[8] But defendant filed no amended return. Moreover, according to the defendant's own testimony, the offer of compromise was submitted fifteen months after he learned about his false returns and after an almost equivalent amount of time had passed since his newly retained accountant had informed him of the amount of taxes due the government. This length of time might well have been considered by the trial court to have destroyed whatever slight probative value a prompt offer might have had. Further, the language "criminal and/or civil liabilty" was confusing,[9] and, as such, was properly withheld from the consideration of the jury.[10] It follows that, in the circumstance of this case, the requested charge was not appropriate and need not have been granted.[11]

 Defendant presses upon us the contention that he was denied his right to a fair and impartial trial by the remarks of the trial court and because the jury, sequestered on order of the court, was taken to see an allegedly prejudicial motion picture.

The record before us is a voluminous one. We have examined it carefully and we find no merit in defendant's contention. The statement of the Supreme Court in Glasser v. United States, 315 U.S. 60, at page 83, 62 S.Ct. 457, at page 471, 86 L.Ed. 680, seems particularly apposite here. "The trial was long and the incidents relied on by petitioners few. We must guard against the magnification on appeal of instances which were of little importance in their setting."

So far as the motion picture incident is concerned, the record reveals that, on the fourteenth day of the trial, defense counsel moved for a mistrial on the ground that the jury had several evenings before been taken to see a motion picture entitled "The Damned Don't Cry." Defense counsel then proceeded to relate to the trial court his hearsay version of the plot. The motion was denied. We do not think it was incumbent upon the trial court to initiate an inquiry among the jurors as to the effect of the movie or to declare a mistrial merely on the hearsay account of counsel, hardly competent evidence upon which a court can determine prima facie the possibility of prejudice to the defendant. The burden was on defendant to show the reasonable possibility of prejudice, and that burden has not been sustained. See United States v. Carruthers, 7 Cir., 1946, 152 F.2d 512, 518–519.

Out of an abundance of caution, however, we have examined a transcript of the dialog of the motion picture which defense counsel submitted to us during oral argument. "The Damned Don't Cry" is indeed a lurid tale. Its locale is the underworld; it is a story of rackets and gangland disloyalty. A few isolated sentences allude to

8. See Heindel v. United States, 6 Cir., 1945, 150 F.2d 493, 497, a criminal prosecution for wilfully attempting to evade the payment of income taxes. The government there introduced into evidence the amended return filed by defendant therein after the taxable year, which was, in effect, an admission that the first return was erroneous. Evidence offered thereafter by defendant that this additional tax was promptly paid was excluded by the trial court. The Court of Appeals, in reversing on another ground, held that this evidence should have been admitted.

9. Cf. State ex rel. Adler v. Douglas, 1936, 339 Mo. 187, 95 S.W.2d 1179.

10. If interpreted as an offer conditioned on a release of criminal and civil liability, then the offer of compromise should most certainly have been excluded. If the language be interpreted as disjunctive, however, the meaning becomes confused for such interpretation suggests an alternative offer: release of civil liability or release of criminal liability. But the second alternative is a highly incredible one in that it is an offer to release defendant's criminal liability for $350,000, leaving his civil liability unaffected.

11. The defendant also alleges as error the refusal of the trial court to charge that the jury must acquit if they found that defendant, before the investigation began, intended at some time to file amended returns and pay his taxes thereon. This is obviously not a correct statement of the law, and was properly refused.

mistakes in income tax returns and to lawful ways of reducing taxes. We fail to find anything in the film that could fairly be said to incite prejudice.[12] Moreover, the trial court, in its charge, specifically cautioned the jury to disregard anything they might have seen or heard at the movies.

It is our belief, nonetheless, that films about crime and the underworld are probably not the best entertainment for juries engaged in a criminal case of any kind. We concur in the view expressed by the Criminal Court of Appeal of Oklahoma that it is dangerous practice for jurors to be allowed to attend motion pictures unless the nature of the picture is learned in advance. Bernell v. State, 1942, 74 Okl.Cr. 92, 123 P.2d 289, 293.

■■■ Defendant alleges as error the denial by the trial court of several requests for instructions. Two of these requests were to the effect that even if defendant were acquitted, the government still had a civil remedy to collect all taxes due. A third requested instruction was a direction to the jury that if it should find that Tross aided in the preparation of the false returns without the knowledge of defendant, then the jury must acquit defendant. All three instructions were adequately covered by the general charge. A court is free to use language of its own choice in charging a jury so long as the essentials of the requested instruction are incorporated into the general charge. United States v. Berg, 3 Cir., 1944, 144 F.2d 173, 177.

■■■ Defendant was fined $10,000 and sentenced to imprisonment for three years on each of the first two counts, the prison sentences to be served consecutively. Suspending sentence on the third count, the court placed defendant on probation, the period to commence upon his release from prison. As a condition of probation, it was ordered that defendant pay all income taxes due the United States government, with interest and penalties added thereto, not later than ninety days after the commencement of the probation period. This condition is attacked as invalid on the ground that it may prevent or hamper the adjudication of his civil liability.

The Criminal Code allows the trial court to suspend sentence and place the defendant on probation upon such terms and conditions as the court deems best, and the court is authorized to condition probation on the defendant's making "restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had * * *." 18 U.S.C. § 3651. This section has been interpreted to mean that the court's right to order restitution is limited to actual damages or loss caused by the offense of which defendant is convicted. See Karrell v. United States, 9 Cir., 1950, 181 F.2d 981, 986, certiorari denied 340 U.S. 891, 71 S.Ct. 206, 95 L.Ed. 646; United States v. Follette, D.C.Pa.1940, 32 F.Supp. 953. Since the exact amount due the government is not normally determined in a criminal action such as this, determination of the amount owed must await either defendant's acquiescence in the government's assessment of deficiency, or else final judicial adjudication. We interpret the court's order to mean that probation on count three is conditioned on the payment by defendant of all income taxes *finally determined* to be due for the years involved. If, on the date of his release from imprisonment, there has been no final determination of defendant's tax liability, this condition, unless modified, would thus be inoperative.

For the above reasons, the judgment of the District Court will be affirmed.

12. Cf. Norwood v. State, 1932, 120 Tex. Cr.R. 510, 48 S.W.2d 276 (Prosecution for rape; jury taken to see film the moral of which was that illicit relations destroy the home; new trial granted.) Bernell v. State, 1942, 74 Okl.Cr. 92, 123 P.2d 289, 293 (Prosecution for murder; jury taken to see film about an ex-convict who was trying to "go straight"; new trial refused.) State v. Hawkins, 1938, 214 N.C. 326, 199 S.E. 284, 289 (Prosecution for murder; jury taken to see murder mystery film, new trial refused.) See also Hyde v. State, 1947, 212 Ark. 612, 206 S.W.2d 739, 741; Catalina v. People, 1939, 104 Colo. 585, 93 P.2d 897, 898; Powell v. Commonwealth, 1938, 276 Ky. 234, 123 S.W.2d 279, 284; State v. Ledet, 1947, 211 La. 769, 30 So.2d 830, 833.